COLIN K., et al.

v.

Thomas C. SCHMIDT, et al.

MIDDLETOWN SCHOOL COMMITTEE

v.

Arthur R. PONTARELLI, et al.

Civ. A. No. 80-248.

United States District Court,
D. Rhode Island.

April 21, 1982.

Patricia M. Beede, R. I. Legal Services, Newport, R. I., for plaintiffs.

Forrest L. Avila, R. I. Dept. of Ed., Providence, R. I., Joseph Going, Newport, R. I., for defendants.

## OPINION AND ORDER

PETTINE, Chief Judge.

These consolidated cases concern Colin and Alan, two children afflicted by learning disabilities and associated emotional problems. Alan is now twelve years old, and Colin is fourteen. These children and their father, residents of Middletown, Rhode Island, brought suit against the Middletown School Committee [hereinafter "MSC"] and its members, the Newport County Regional School Committee [hereinafter "NCRSC"] and its members, the Superintendent of the Newport County Regional Special Education Program [hereinafter "NCRSEP"], who is responsible for the provision of special education to children residing in a four town area including Middletown, and the Rhode Island Commissioner of Education [hereinafter "Commissioner"].

Plaintiffs allege that the proposal of MSC and the Superintendent of NCRSEP to educate the children in a "self-contained"[1] classroom for learning disabled children within the regional special education program violates the children's rights under the Education of All Handicapped Children Act [hereinafter "EAHCA"], 20 U.S.C. § 1401 et seq.,[2] the Rehabilitation Act [hereinafter "RHA"], 29 U.S.C. § 794,[3] the equal protection clause of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.[4] Plaintiffs contend that federal law[5] requires MSC to fund the special education of these children at the Landmark School, a private, residential facility in Massachusetts. Colin, Alan and their father thus seek a declaration that MSC's proposed placements are inadequate and a permanent injunction ordering MSC to fund the children's placement at Landmark. Moreover, they request an award of compensatory and punitive damages for the 1979–80 school year, during which plaintiffs claim that MSC failed to provide them a "free appropriate education" by not funding their education at Landmark. Because this Court has already held that damages are not available under the EAHCA, Colin K. v. Schmidt, C.A. No. 80–0248, unpublished opinion at 3–4 (D.R.I. Dec. 14, 1981), the plaintiffs are now pursuing their damages claim under the RHA, the equal protection clause, and 42 U.S.C.

1. For purposes of this opinion, "self-contained classroom" is defined as a classroom in which only handicapped children are educated.

2. The EAHCA requires states receiving federal funds under the statute to assure to "all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). "Free appropriate public education" is defined as "special education and related services." 20 U.S.C. § 1401(18). Furthermore, the regulations implementing the EAHCA impose this same duty on municipalities within states receiving federal money. 45 C.F.R. § 121a.2(b) (1980).

3. The RHA prohibits discrimination in any state program receiving federal funds. It provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794.

Defendants MSC and NCRSEP admit in their answer that they receive federal funds pursuant to the EAHCA.

The regulations promulgated pursuant to the RHA interpret the Act as requiring recipients of federal funds to provide a "free appropriate public education" to handicapped children. 45 C.F.R. § 84.33(a) (1981).

4. Section 1983 provides in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

5. Although plaintiffs' complaint contains pendent state law allegations, plaintiffs have not argued any state law claims in their recent memoranda to the Court. E.g., Plaintiffs' Memorandum in Support of their Motion for Partial Summary Judgment on the Record at 6 (June 30, 1981) ("Plaintiffs' claims arise out of the [RHA] ..., the [EAHCA] ..., and ... 42 U.S.C. § 1983."). Thus, the Court assumes that plaintiffs have dropped their pendent state law claims.

§ 1983.[6] The cases are now before the Court on plaintiffs' motion for summary judgment as to all issues except amount of damages.

### FACTS

#### 1. History of the Litigation

The factual background of these consolidated matters is extensive and requires setting forth in great detail. Both Alan and Colin are currently attending Landmark School, and MSC has agreed to fund this placement pending resolution of the cases at bar. Prior to moving to Rhode Island in 1979, the children attended a private day school for learning disabled children in Washington, D. C. known as the Kingsbury Lab School [hereinafter "Lab School"]. Alan went to the Lab School for three years (1976–79), and Colin attended the school for four years (1975–79). The School Committee of Montgomery County, Maryland, in which the children then resided, funded the Lab School placement. Had Alan and Colin not moved to Rhode Island in 1979, they would have continued to attend the day program at Lab School, although the School intended to add psychological counselling to their individualized educational programs [hereinafter "IEPs"].[7] Tr. Case of Colin [hereinafter "CC"] at 29, 41 (Feb. 2, 1980) (testimony of Karen Duncan). Both boys were making "slow, but steady" progress at Lab School. Deposition of Karen Duncan at 64 (Sep. 3, 1980) [hereinafter "Deposition"]. See Tr. CC at 46, 56 (Jan. 9, 1980) (testimony of Dr. Eric Denhoff).

Prior to moving to Rhode Island in 1979, the children's father asked Lab School to recommend a facility in the New England area that could continue the program that Lab had offered. Lab School recommended the Landmark School in Massachusetts. Tr. Case of Alan [hereinafter "CA"] at 94–97 (Jan. 18, 1980) (testimony of Karen Duncan). Thus, upon enrolling his children in NCRSEP, the father sought funding for special education on a residential basis at Landmark.

After an evaluation of the two boys by a regional diagnostic team, the Superintendent of NCRSEP determined that the children could be educated in self-contained special education classrooms within the regional program. IEPs providing for such placement were prepared for each child.

Their father, however, rejected this proposal, contending that the severity of the children's handicaps required a more intensive residential placement at Landmark. Thus, he filed an administrative complaint, and an administrative hearing was held. The local hearing officer's decision, which was affirmed on appeal by a review officer designated by the Commissioner, found that the IEPs drawn up by MSC failed to provide a "free appropriate education" as required by state and federal law. The local hearing officer held that MSC's proposed program was insufficiently intensive in view of the boys' "severe learning disabilities with accompanying behavioral manifestations." Local Hearing Officer's Decision Re: Alan K. at 5 (Mar. 5, 1980); Local Hearing Officer's Decision Re: Colin K. at 4, 6 (Mar. 5, 1980). Thus, MSC was ordered to prepare a new IEP. However, the hearing officer did not reach the issue of whether Landmark School was an appropriate placement.

On May 29, 1980 plaintiffs filed suit in federal court after determining that the defendants had not complied with the rulings of the local hearing officer and state review officer that MSC prepare new IEPs for the children. While this suit was pending, MSC drew up new IEPs still not calling for placement at Landmark School. Rather, the new IEPs provided for placement of both boys in self-contained learning disabilities classrooms with a pupil/teacher ratio of as high as one-to-ten. Each boy would re-

---

**6.** Plaintiffs seek relief under § 1983 only for violation of their rights to equal protection, not for violation of the RHA. Plaintiffs' Memorandum on Availability of Damages at 9 n. 4 (Mar. 2, 1982).

**7.** An IEP is a statement of a handicapped child's present education level, future educational goals for the child, future educational services to be provided to him, and the extent to which he will be able to participate in regular educational programs. 20 U.S.C. § 1401(19).

ceive instruction in "core" academic subjects from a teacher specially trained in learning disabilities and assisted by an aide. The IEPs provided for education of the children together with non-handicapped students "where applicable," listing such subjects as art, music, physical education, home economics, and woodworking.[8] In addition, the students would receive small group instruction in "some skills" and one-to-one tutoring on "specific needs." Furthermore, the IEPs called for psychological counselling by a private psychologist and "follow-up support help" by the in-school psychologist. Alan would receive private counselling twice a week for the first month and more often later if necessary; Colin would receive counselling once a week for the first month and more often later if necessary. Finally, the boys' father would participate in this counselling. Except for the addition of counselling services, these IEPs were almost identical to those originally prepared for the children.

Rather than rule on whether the revised IEPs provided for an "appropriate" special education for the plaintiffs, this Court remanded the question of the IEPs' adequacy to the state administrative process. In August 1980 the local hearing officer approved the new IEPs as modified by him. He

determined that a residential placement was inappropriate because it would not be the "least restrictive" means of providing an appropriate special education.[9] However, this decision was reversed on appeal in January, 1981.

The Commissioner's designated review officer, an employee of the state department of education, found insufficient evidence to support the hearing officer's failure to sustain his earlier findings as to the severity of the children's handicaps and the inappropriateness of MSC's proposals. The review officer held that MSC's new IEPs were inadequate. Moreover, because the parties had agreed to limit themselves to placements at either Landmark School or within the regional special education program, see Decision of State Review Officer at 2 n. 2 (Jan. 16, 1981), the review officer ordered MSC to fund the children's placement at Landmark School.

Rather than appeal the January 1981 state administrative order to this Court, MSC appealed to the Rhode Island Family Court for the County of Newport. Plaintiffs in this action, defendants in the state appeal, filed a petition to remove the state suit to this Court. The Court held that the state action was removable. *Colin K. v. Schmidt,* 528 F.Supp. 355 (D.R.I.1981).[10]

---

8. For purposes of this opinion, education of handicapped students in classes with non-handicapped children will be referred to as "mainstreaming." At the time of the second round of administrative hearings in this litigation, MSC was uncertain as to the extent of possible mainstreaming and when it would occur. See Tr. at 860 (July 31, 1980) (testimony of O. William Hilton).

9. The EAHCA requires states receiving federal funds under the Act to "assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs" only when necessitated by the severity of a child's handicap. 20 U.S.C. § 1412(5)(B). States and localities must thus attempt to educate a student in the "least restrictive" educational environment that can provide an appropriate education. *See Springdale School District No. 50 v. Grace,* 656 F.2d 300, 305 (8th Cir.), *petition for cert. filed,* 50 U.S.L.W. 3390 (U.S. Sep. 25, 1981).

10. The EAHCA provides that "[a]ny party aggrieved by the findings and decision [of an administrative body] ... shall have the right to bring a civil action ..., which action may be brought in any State court of competent jurisdiction or in a district court of the United States...." 20 U.S.C. § 1415(e)(2). The plaintiffs ceased to be "aggrieved" after the Rhode Island Commissioner of Education issued his January 1981 decision, which ordered MSC to fund the children's placement at Landmark School and which plaintiffs admit was "wholly favorable" to them. Plaintiffs' Memorandum in Opposition to Middletown Defendants' Motion to Dismiss and Remand at 7. Thus, "[b]ecause plaintiffs [were] no longer aggrieved as to their EAHCA claims for injunctive and declaratory relief, this Court dismisse[d] these claims, lacking jurisdiction under 20 U.S.C. § 1415(e)(2) to adjudicate them. *See Scruggs v. Campbell,* 630 F.2d 237, 238–39 (4th Cir. 1980)." *Colin K. v. Schmidt,* C.A.No. 80-0248, unpublished opinion at 3 (D.R.I. Dec. 14, 1981).

However, this Court's ruling that plaintiffs could no longer press their EAHCA claims be-

### 2. Severity of the Children's Disabilities and their Educational Needs

Two rounds of administrative hearings and appeals, consisting of over twenty-five days of testimony, have produced a voluminous record concerning the special educational problems of Colin and Alan. In addition, the record in this matter contains various affidavits, a deposition of a Lab School teacher who worked closely with the boys, diagnostic evaluations, and final progress reports prepared by the Lab School. A summary of relevant information about the children follows.

The person most familiar with the disabilities and accompanying emotional problems of both Colin and Alan is Karen Duncan, a special education teacher at Lab School. She helped develop the Lab School IEPs for both Colin and Alan, worked with them daily as their head teacher during the 1978–79 school year, and "came in contact with them daily, but on a more limited basis" as a tutor during the 1977–78 school year. Deposition at 3–4. Moreover, she has done testing on each student. *Id.*

Ms. Duncan testified that both Colin and Alan suffer from "severe" behavioral and learning problems. *Id.* at 5; Tr. CA at 56 (Jan. 18, 1980). She explained that both children are easily frustrated and very insecure, and that both fear failure. Deposition at 6; Tr. CC. at 9, 11 (Feb. 2, 1980); Tr. CA at 61 (Jan. 18, 1980).

As to Colin in particular, Duncan testified that he has severe weaknesses in math, reading, and spelling. Deposition at 5. Although Colin has "tremendous potential," after four years of special education at Lab School he was still scoring below his grade level. Tr. CC at 80, 81–82 (Feb. 2, 1980). Colin has a poor auditory memory for the correct order of letters within words and poor visual discrimination, causing him to reverse numbers. Deposition at 6–7. In addition, his weak visual discrimination for letters within words causes him to transpose letters. *Id.* at 7. He also omits words when reading. *Id.* Furthermore, Duncan explained that Colin lacks "self-monitoring" skills, and needs continuous monitoring and "constant feedback" as to what is appropriate behavior in the classroom. Tr. CC at 8 (Feb. 2, 1980). Colin is "highly distractable," having difficulty in focusing in on a subject and screening out background stimuli. *Id.* at 12. Duncan also stated that Colin lacks confidence in his ability to perform in physical education classes, and that he suffers from "gross motor" problems. *Id.* at 18.

As to Alan, Ms. Duncan explained that he is extremely bright and creative, but extremely inconsistent day to day. Tr. CA at 45 (Jan. 18, 1980); Deposition at 8. She suggested that Alan displayed more of the severe behavioral problems arising out of severe learning disabilities than did Colin. Deposition at 8. Like Colin, Alan is exceptionally unorganized and highly distractable. *Id.* at 8. When reading, Alan will skip entire lines. Tr. CA at 60 (Jan. 18, 1980). Like Colin, he has poor auditory memory, and suffers from visual reversals of numbers and words. *Id.* at 60, 67. Ms. Duncan further noted that Alan would lapse into infantile behavior when he encountered difficult academic problems. *Id.* at 70. Finally, she explained that Alan had severe problems interacting with students outside his normal group at Lab, and that transitions from one group to another cause his behavior to deteriorate. *Id.* at 53–54.

Because of the severity of their learning disabilities and accompanying behavioral problems, Ms. Duncan found MSC's proposed placement in self-contained classes with mainstreaming "where applicable" in-

---

cause not "aggrieved parties" had purely academic impact. Although plaintiffs, *qua plaintiffs*, could not continue to litigate their EAHCA claims, the Court ruled that they could do so *as defendants* in MSC's appeal of the January 1981 ruling of the Commissioner of Education. *Id.* at 6 n. 3. MSC's state court action was brought in part pursuant to § 5 of the EAHCA, 20 U.S.C. § 1415(e)(2), and MSC's complaint alleged that the January 1981 administrative decision was inconsistent with the provisions of the EAHCA. Thus, this Court held that the plaintiffs could "continue to argue their EAHCA claims without interruption," treating plaintiffs' motion for summary judgment in the original federal action as if filed in the removed suit. *Colin K. v. Schmidt, supra,* at 6 n. 3, 7 n. 7.

appropriate. She contended that both Colin and Alan need small classes, preferably with no greater than a three-to-one pupil teacher ratio. *Id.* at 58; Tr. CC at 13 (Feb. 2, 1980); Deposition at 10. She stated that creative, intensive, highly individualized teaching was necessary in order to permit the boys to "actualize" their "tremendous social and intellectual potential." Deposition at 11, 13. Their teacher must be able to make instantaneous curriculum changes if the students prove unable to "cope" with a particular curriculum, *id.* at 11, 12, and must integrate their interests into their full program in order to keep them interested. Tr. CC at 13 (Feb. 2, 1980). This she obviously thought was impossible in a class of ten students and one teacher.

In addition, Duncan attacked the mainstreaming component of the MSC IEPs. She felt that *any* degree of mainstreaming—even in art, music, or physical education classes—would be detrimental to Colin and Alan. Deposition at 20, 22; Tr. CC at 46–47 (Feb. 2, 1980). She suggested that Alan's need to feel successful and his inability to handle transitions between different groups prevented any mainstreaming. Tr. CA at 92 (Jan. 18, 1980). In short, mainstreaming would exacerbate both boys' feelings of insecurity. Deposition at 15, 22. However, being around other learning disabled students exclusively would allow Colin and Alan to develop confidence and "take risks" in learning. *Id.*

Finally, Duncan attacked the adequacy of counselling services to be provided under the latest IEPs. She stated that outside psychological counselling twice a week, even with in-school psychological follow-up support, would be ineffective. *Id.* at 16. She felt that the teacher must be able to provide such support whenever needed.

Ms. Duncan was asked why residential placement at Landmark was necessary, and why a more intensive program within the public regional special education system would not suffice. She responded that Landmark School was the only facility oth-er than Lab School that could provide what Colin and Alan needed. Tr. CC at 40 (Feb. 2, 1980). She "just didn't believe" that the boys could get what they required in a public system. *Id.* at 47. She noted that, had the plaintiffs moved to Massachusetts, she would have recommended that Colin and Alan attend the *day* session at Landmark and not enter its residential program. *Id.* at 40; Deposition at 54. (In fact, had the students not moved to Rhode Island, they would have continued attending the non-residential *day* session at Lab School, although Lab intended to provide psychological counselling services and to work closely with the boys' father. Tr. CC at 39, 40, 41 (Feb. 2, 1980)). However, Duncan stated that residential placement was now necessary for two reasons. First, the children's father lived too far away from Landmark to transport the children there each day. Second, she felt that an intensive residential program was necessary to compensate for their regression during the 1979–80 year. *Id.* at 40–43. During this year the children's father kept them out of any public special education program [11] because he felt that MSC's proposed placement was inappropriate. Plaintiffs' Reply Memorandum at 32 (Feb. 19, 1982).

In addition to Ms. Duncan, Dr. Eric Denhoff testified as to the severity of the children's disability and emotional problems and the inadequacy of the MSC IEPs. Denhoff is a pediatrician who specializes in handicapped children. Tr. CC at 7 (Jan. 9, 1980). He has written numerous articles on learning disabled children and is also medical director of a day school for the special education of handicapped students. *Id.* at 13. Denhoff made a neurological evaluation of both Colin and Alan. *Id.* at 25; Affidavit of Eric Denhoff, M.D. at 2 (May 29, 1980). In addition, he reviewed the psychological, social, psychiatric and pediatric reports prepared by defendants on both children and examined the Lab School's final progress reports. Tr. CC at 27–30 (Jan. 9, 1980); Affidavit of Eric Denhoff, M.D. at 2 (May 29, 1980).

---

11. However, the children did receive home tutoring in mathematics from Susan Roque, a certified special education teacher provided by defendants, for about four hours a week for six weeks.

Based on his testing and his review of other evaluations, Denhoff testified that Colin and Alan both suffer from "profound" genetic and developmental dyslexia. Tr. CC at 31, 38 (Jan. 9, 1980); Tr. CA at 9, 10 (Jan. 14, 1980). This problem causes the children to dissociate what things sound like from what they look like. Tr. CA at 10 (Jan. 14, 1980). Denhoff characterized their learning disabilities as "severe" and "profound." Id. at 8; Affidavit of Eric Denhoff, M.D. at 2, 3 (May 29, 1980). Denhoff stated that both boys suffer from "attentional deficits." Tr. CC at 60 (Jan. 9, 1980); Tr. CA at 9 (Jan. 14, 1980). Furthermore, Dr. Denhoff noted that Alan has "high risk" emotional problems, due to chronic failures in school, that "would interfere with academic progress." Tr. CA at 9–10 (Jan. 14, 1980). Colin is destined for psychiatric problems unless he receives "supportive" help. Tr. CC at 39 (Jan. 9, 1980).

Denhoff contended that MSC's proposed placement was inadequate because children with "very severe problems do not do well in public school systems." Tr. CC at 58 (Jan. 9, 1980). He stated that both boys need dedicated teachers intensely knowledgeable about genetic dyslexia, but that public schools have no control over how qualified or dedicated a teacher is. Id. at 56. Moreover, Denhoff agreed with Ms. Duncan that mainstreaming in any subject would be dangerous for Alan and Colin. Denhoff asserted that both boys need a protective and secure environment, and that such an environment could not co-exist with mainstreaming. Id. at 41–45; Tr. CA at 15 (Jan. 14, 1980); Affidavit of Eric Denhoff, M.D. at 3 (May 29, 1980). Finally, Dr. Denhoff thought that Alan needed a comprehensive, individualized program, Tr. CA at 10 (Jan. 14, 1980), that Colin needed a one-to-one system, Tr. CC. at 41 (Jan. 9, 1980), and that Landmark's residential program alone could provide such services. Affidavit of Eric Denhoff, M.D. at 3 (May 29, 1980) (no school in Rhode Island appropriate; Landmark appropriate).

Among the witnesses who testified during the two rounds of administrative hearings were the members of the NCRSEP evaluation team that evaluated Colin and Alan and recommended public placements in self-contained classes for them. One member was Karen Cosel, a Rhode Island school psychologist who performed psychological tests on the two boys. Although she concurred in MSC's IEPs, she found Alan's mathematical and spelling disabilities to be "severe." Tr. CA at 57, 58–59 (Jan. 8, 1980). Similarly, she found that Colin's disability in reading was "severe," but not "profound." Tr. CC at 11 (Jan. 8, 1980). Based on her examination of the boys' past records and her own testing, she felt that residential placement was unnecessary. Id. at 20; Tr. CA at 86 (Jan. 8, 1980). She recommended placement in self-contained public classrooms, where the boys could meet with success, and one-to-one tutoring in certain areas for part of each day. Tr. CC at 16, 17 (Jan. 8, 1980); Tr. CA at 66 (Jan. 8, 1980).

Dr. Elliott Urdang, a psychiatrist, was another member of the NCRSEP team that evaluated the children and testified at the hearings. He gave psychiatric tests to Colin and Alan, reviewed the evaluations of the other team members, and concurred in the proposed placement. Tr. CA at 6 (Jan. 16, 1980); Tr. CC at 3, 9, 10 (Jan. 16, 1980). He stated that the boys had "roughly similar" emotional problems. Tr. CC at 8 (Jan. 16, 1980). He felt that Alan had "major" learning disabilities, and that the discrepancy between Colin's intelligence and achievements was great enough to warrant the diagnosis "serious to severe." Id. at 7; Tr. CA at 7–8 (Jan. 16, 1981). He believed that residential psychiatric care for the boys was unnecessary. Tr. CC at 9 (Jan. 16, 1980); Tr. CA at 16 (Jan. 16, 1980).

Another member of the evaluations team who testified was Susan Roque, a NCRSEP tutor who taught mathematics to the two boys at home for about four hours a week for six weeks during the 1979–80 school year. Tr. at 236, 253–54 (July 7, 1980). She has a Rhode Island certificate enabling her to teach mild to profoundly handicapped students. Id. at 240. Based on her limited exposure to Colin and Alan, she stated that they are only "moderately learning disabled," do not require a residential place-

ment, and could function in a public self-contained classroom. *Id.* at 271.

At the second administrative hearing defendants also called as witnesses the directors of special education programs in three Rhode Island towns: Virginia Lee Dixon, Ph.D.; Leo Dolan; and Marjorie Hanson. None of these witnesses had ever seen or tested either boy, but had reviewed records about them. All testified that MSC's proposed placement of the children in self-contained public classrooms was appropriate. Tr. 421, 424–25, 428 (July 9, 1980) (Dixon); Tr. 507 (July 11, 1980) (Dolan); Tr. 560 (July 11, 1980) (Hanson). However, Dr. Dixon stated that she would not immediately mainstream the boys, but would "wait and see" if the children made "ready adjustment" to the self contained classroom situation. Tr. at 425–26 (July 9, 1980).

Two representatives of the Landmark School also testified at the hearings: the headmaster, Dr. Drake; and a liaison who works with public special education programs, Mr. Rutter. Dr. Drake is a licensed psychologist and a specialist in learning disabilities. Tr. CA at 50 (Jan. 25, 1980). He testified that he personally interviewed Colin, and that the Landmark staff tested both children. *Id.* at 72; Tr. CC at 3 (Jan. 25, 1980). Based on this testing, his interview with Colin, and the boys' prior records, Tr. CA 62–63 (Jan. 25, 1980); *see* Tr. CC at 11 (Jan. 25, 1980), Dr. Drake characterized Colin as a "severe case of specific learning disability." Tr. CC at 31 (Jan. 25, 1980). He noted that Colin was still performing below average despite several years of specialized education. *Id.* at 32. He stated that the "optimal," "best" and "appropriate" placement was a highly structured residential program because "[h]e's got about two and a half more years to get this together. . . . [or] he's going to be in . . . bad trouble." *Id.* at 32–33.

As for Alan, Dr. Drake noted that "if he is not subjected to the most intensive educational efforts that can be made, he is likely to go into early adolescence feeling pretty much a failure." Tr. CA at 102 (Jan. 25, 1980). Drake would recommend either private day or residential placement for Alan because, even "after two and three years of good intensive day school work, we're still getting, when [the children] try to write, . . . profoundly distorted words . . . [and] reversals . . . ." *Id.* at 101. In short, Drake stated that "from my own reading, what I have heard from [the Lab School], from what I have seen and based on working with several thousand such children is that for the present moment neither of these children is ready to go into a public school classroom and be adequately served. . . . [They] need to be under continuous teaching . . . ." *Id.* at 101, 102.

The other Landmark representative, Mr. Rutter, described the program that Alan would enter at Landmark. He stated that Alan would receive a language/arts individual tutorial ten minutes per day, five days per week, focusing on reading, spelling, composition, and handwriting. Tr. CA at 26 (Jan. 15, 1980). Furthermore, he stated that Alan would receive instruction in certain areas, such as math, in small groups ranging from three to seven pupils per teacher. *Id.*

O. William Hilton, Superintendent of NCRSEP, also testified at both administrative hearings. He has a college degree in special education. Tr. at 579 (July 22, 1980). He was chairman of the NCRSEP case conference team that examined Colin and Alan and that developed both sets of IEPs for them. His testimony basically summarized the placements that MSC had proposed for the two children. He also stated that all members of the case conference team agreed that residential placement was unnecessary, and that placement within a public self-contained classroom was appropriate.

Furthermore, he stated that under no circumstances do learning disabled students belong in residential placements. Tr. CC at 60, 69, 71 (Feb. 6, 1980). He explained that MSC "take[s] care of all [its] learning disability youngsters within [the] regional program." *Id.* at 60. However, MSC would provide residential placements for visually impaired students and those whose emotional problems overwhelm their learning disa-

bilities and become the primary handicapping condition. *Id.* at 63, 69.

Finally, the Court reviewed the IEPs and final progress reports drawn up by Lab School for Colin and Alan. The reports corroborate Ms. Duncan's evaluations of the boys' disabilities and emotional problems. The IEPs for the 1979–80 school year provided, in part, for psychological counselling for both boys and for one-to-one tutorials in various subjects. Alan's IEP indicated that he would have been placed in a small classroom group of nine students and in small working groups of no more than three children under the direction of a teacher and two classroom aides.

## DISCUSSION

1. *Procedural Defects in Administrative Hearings*

■ Plaintiffs bring this action, in part, under the EAHCA. This statute requires that parents or guardians displeased with the educational placement of a child must first exhaust state administrative remedies before they may file an action under the EAHCA in court.[12] The statute contains detailed provisions concerning how state and local educational agencies must conduct initial hearings and appellate review of those hearings. In particular, the initial "impartial due process hearing," which may be conducted by either the local or state educational agency, may not "be conducted by an employee of such agency ... involved in the education or care of the

child." 20 U.S.C. § 1415(b)(2). Where, as in Rhode Island, the local educational agency conducts the initial hearing, any party aggrieved by the hearing officer's decision "may appeal to the State educational agency which shall conduct an impartial review of such hearing. The [reviewing] officer ... shall make an independent decision upon completion of such review." *Id.* § 1415(c).

Defendants contend that the January 1981 administrative decision, which ordered MSC to fund the children's placement at Landmark, is invalid under the EAHCA because the review officer was an employee of the state educational agency. Although the language of the EAHCA *expressly* prohibits employees of agencies involved in the education of a child from conducting the *initial* hearing, *see id.* § 1415(b)(2), the legislative history clearly indicates that this prohibition extends to state review officers as well. *Vogel v. School Board*, 491 F.Supp. 989, 994–95 (W.D.Mo.1980). The Senate Conference Report on the EAHCA states that:

> no hearing may be conducted by an employee of the State or local educational agency involved in the education or care of the child. The conferees have adopted this language to clarify the minimum standard of impartiality which shall apply to individuals conducting a review of the local due process hearing....

Sen.Conf.Rep.No. 455, 94th Cong., 1st Sess. 49 (1975), *reprinted in* [1975] U.S.Code

---

**12.** 20 U.S.C. § 1415(b)(2), (c), (e)(2) provide in part:

> (b)(2) Whenever a complaint has been received [by an educational agency] ..., the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.
> (c) If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the

findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.... (e)(2) Any party aggrieved by the findings and decision made under subsection (b) who does not have the right to an appeal under subsection (c), and any party aggrieved by the findings and decision under subsection (c), shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy....

Cong. & Ad.News 1425, 1502 [hereinafter "Conference Report"]. MSC thus contends that the January 1981 "review officer's decision should not be allowed to stand," MSC's Brief in Opposition to Plaintiffs' Motion for Summary Judgment at 47 (Jan. 18, 1982), apparently requesting the Court to require another administrative review by one not an employee of the state educational agency.

The Court finds MSC's contention to be unmeritorious. Even assuming that the Rhode Island state educational agency is involved in the "education or care" of Colin and Alan, Conference Report 49, *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1502,[13] MSC is not the proper party to challenge the alleged defect in the state review procedure. Local educational agencies are simply not within the "protected class" that Congress envisioned when it prohibited review officers from being employees of the state educational agency involved in the care of the handicapped child at issue. The legislative history of 20 U.S.C. § 1415(c) indicates that this prohibition was intended exclusively to benefit handicapped children and their parents and guardians by insuring absolute impartiality in the administrative process. *See* Conference Report 49, *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1502 ("[A]ny parent or guardian may present a complaint concerning any matter", and "[t]he hearing will be conducted by an impartial ... officer since the State or local agency ... will be a party to any complaint presented.")

■ Furthermore, the Court would not necessarily remand the EAHCA issues for a new administrative review proceeding even if MSC *were* entitled to raise the procedural defects alleged here. The EAHCA provides for *de novo* review by courts after exhaustion of administrative processes. The statute mandates that "the court shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Because the court's role in EAHCA proceedings is to assess the evidence independently, not to affirm or reverse administrative decisions or even to remand with instructions, *Kruelle v. New Castle Cty. School District*, 642 F.2d 687, 692 (3d Cir. 1981); *Anderson v. Thompson*, 495 F.Supp. 1256, 1260–61 (E.D.Wis.1980), *aff'd on other grounds*, 658 F.2d 1205 (7th Cir. 1981); Note, *Enforcing the Right to an "Appropriate" Education: The Education of All Handicapped Children Act of 1975*, 92 Harv.L.Rev. 1103, 1108 (1979) [hereinafter "Harvard Note"], defects in state administrative proceedings of the kind alleged here would not prevent the court from deciding EAHCA cases on the merits. *Grymes v. State Bd. of Educ.*, 3 EHLR 552: 279,: 281 (D.Del. Jan. 7, 1981) (no remand where state review officer is employee of state educational agency).[14]

---

13. All the authority that the Court has located indicates that state educational agencies are involved in the "education or care" of a child even if they have only a supervisory role over the local *direct* providers of education. *See Helms v. McDaniel*, 657 F.2d 800, 806 n.9 (5th Cir. 1981); *Robert M. v. Benton*, 634 F.2d 1139, 1141–42 (8th Cir. 1980); *Vogel v. School Bd.*, 491 F.Supp. 989, 995 (W.D.Mo.1980). *Compare* S.Rep. 168, 94th Cong., 1st Sess. 29, *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1453 (original version of bill prohibited hearings conducted by "employee[s] of the State or local educational agency *directly involved* in the education or care of the child") (emphasis added) *with* S.Conf.Rep. 455, 94th Cong., 1st Sess. 49 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1502 (final version of bill deleting reference to *"directly"* involved).

14. The defendants also contend that plaintiffs' RHA and § 1983 claims are not properly before this Court because the plaintiffs' EAHCA claims have not properly been exhausted due to the alleged defect in the January 1981 state review decision. The defendants apparently argue that, where RHA and § 1983 claims are joined with EAHCA claims in special education cases challenging placement of handicapped children, EAHCA administrative remedies must be exhausted before *any* of these claims may be brought. Although the Court agrees with the latter argument, *Turillo v. Tyson*, 535 F.2d 572, 585 (D.R.I.1982), exhaustion of EAHCA administrative remedies has clearly occurred in this case. Plaintiffs have proceeded through the state administrative process twice, and defendants have no standing to challenge the only alleged defect in these proceedings. Plaintiffs' RHA and § 1983 claims are thus properly before this Court.

### 2. *Appropriateness of MSC's Proposed Placement*

#### a. *Injunctive and Declaratory Relief*

■ Plaintiffs claim that MSC's proposed placement of Colin and Alan in public self-contained classrooms violates their rights to a free appropriate education under the EAHCA, RHA, and the equal protection clause. They argue that residential placement at Landmark School is the appropriate special education for the children. The Court finds that, based on a preponderance of the evidence in the administrative record, 20 U.S.C. § 1415(e)(2), MSC's present proposals calling for placement within public classrooms with pupil/teacher ratios possibly as high as ten-to-one and providing for some mainstreaming violate the children's right to a free appropriate education under the EAHCA.[15] Because MSC's proposed IEPs are clearly inadequate, and because the Landmark placement provides *at least* an appropriate special education, the Court orders MSC to continue funding the children's placement there. However, the present record, parts of which are now over two years old, contains insufficient evidence on which the Court can intelligently decide what effect a *more* intensive non-residential placement would have on the children. Thus, the Court declines to decide whether placement at Landmark, or residential placement generally, is minimally necessary in order to provide Colin and Alan with a free appropriate education under the EAHCA.

To assess the adequacy of MSC's proposed educational program for Colin and Alan, it is necessary to define the term "free appropriate public education" as used in the EAHCA. The statute itself defines the term as including "special education and related services." *Id.* § 1401(17). "Special education" is, in turn, defined as "specially designed instruction, at no cost to parents or guardians, *to meet the unique needs of a handicapped child....*" *Id.* § 1401(16) (emphasis added). Needless to say, the "language of the Act provides no clear guidelines" for evaluating the adequacy of proposed special education. Harvard Note, *supra*, at 1125.

Courts have struggled to give concrete meaning to the requirement of a "free appropriate public education." Some courts have stated that a free appropriate education is one that provides each handicapped child an opportunity for achieving his potential commensurate with that provided non-handicapped children. *E.g., Springdale School District No. 50 v. Grace*, 656 F.2d 300, 304–05 (8th Cir.), *petition for cert. filed*, 50 U.S.L.W. 3390 (U.S. Sep. 25, 1981); *Gladys J. v. Pearland Ind. School District*, 520 F.Supp. 869, 875 (S.D.Tex.1981) (dicta); *Hines v. Pitt Cty. Bd. of Educ.*, 497 F.Supp. 403, 406 (E.D.N.C.1980); *Rowley v. Bd. of Educ.*, 483 F.Supp. 528, 534–35 (S.D.N.Y.), *aff'd per curiam*, 632 F.2d 945 (2d Cir. 1980) (2–1 decision), *cert. granted*, 450 U.S. 907, 101 S.Ct. 1343, 67 L.Ed.2d 331 (U.S.1981). Other courts have observed that a free appropriate education is at least one that enables a handicapped child to become a productive member of society, as free from dependence on others as his handicap reasonably permits. *Campbell v. Talladega Cty. Bd. of Educ.*, 518 F.Supp. 47, 54 (N.D. Ala.1981); *Armstrong v. Kline*, 476 F.Supp. 583, 603–04 (E.D.Pa.1979), *affirmed and remanded on other grounds sub nom. Battle of Commonwealth of Pennsylvania*, 629 F.2d 269 (3d Cir. 1980), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 781 (1981). *Accord Rowley v. Bd. of Educ.*, 632 F.2d at 949–53 (dissenting opinion, Mansfield, J.).

Whatever the precise definition of "free appropriate public education" is, the term certainly does *not* mean the *best* education possible. *Springdale School District No. 50 v. Grace*, 656 F.2d 300, 304 (8th Cir.), *petition for cert. filed*, 50 U.S.L.W. 3390 (U.S. Sep. 25, 1981); *Bales v. Clarke*, 523 F.Supp. 1366, 1370–71 (E.D.Va.1981); *Rowley v. Bd. of Educ.*, 483 F.Supp. at 534; *Harvard*

---

**15.** Because plaintiff is entitled to injunctive and declaratory relief under the EAHCA, the Court will not discuss the RHA and equal protection clause claims for such relief. However, the Court discusses these latter provisions of federal law in the context of plaintiffs' requests for damages. *See* pp. 1387–1389 *infra*.

Note, supra, at 1125. It is equally clear that a proposed program that would be detrimental to a handicapped child, causing him to stagnate or regress educationally or emotionally, is not appropriate. Because MSC's IEPs run afoul of this latter principle, MSC has violated the plaintiffs' rights under the EAHCA.

The preponderance of the evidence in this case establishes that both Colin and Alan have severe learning disabilities and significant accompanying emotional problems. Testimony by Drs. Denhoff and Drake and Ms. Duncan, not sufficiently controverted by defendants' witnesses, convinces the Court that because of the severity of their handicaps both children need a highly individualized, highly structured, and closely monitored program of instruction in order to learn at all and to progress. The Court finds that placing Colin and Alan in a class with as high as a ten-to-one pupil/teacher ratio would not permit the individualized instruction that these children need in order not to regress. Furthermore, such a high ratio will not be conducive to the sort of creative, flexible teaching that can change the children's curriculum as needed in order to sustain their interests and to encourage them to learn.[16]

Another fatal aspect of the IEPs that MSC has proposed for Colin and Alan is the possibility [17] of mainstreaming "where applicable" in such subjects as art, physical education, and music. The testimony of plaintiffs' experts convincingly demonstrates that *any* mainstreaming in *any* subject would be detrimental to the boys. Mainstreaming would exacerbate both boys' already poor self-images and feelings of insecurity. Transitions from the proposed self-contained learning disabilities classroom to classes with non-handicapped children would cause Alan's behavior to deteriorate, thereby impeding or undermining his ability to learn. Even one of the defendants' own expert witnesses admitted that immediate mainstreaming would be inappropriate. Tr. at 425–26 (July 9, 1980). (Dr. Dixon).

Because the MSC proposals are inadequate because of the pupil/teacher ratio and the possibility of mainstreaming in some subjects, the Court need not speculate on what other aspects of the IEPs are also deficient under the EAHCA. The Court notes, however, that it agrees with the January 1981 observation of the state administrative review officer that MSC's latest IEPs appear to be "grounded in [the] erroneous premise [that Colin and Alan suffer from only moderate learning disabilities]." Decision of Rhode Island Department of Education Review Officer at 7 (Jan. 16, 1981). Thus, the Court advises MSC and NCRSEP that, in order to pass muster under the EAHCA, any proposed *public* special education program for these children must provide educational services, such as one-to-one tutoring in deficient areas, of sufficient intensity to enable *seriously, severely* learning disabled students to learn and to progress. Moreover, any new IEPs calling for public placement must provide sufficiently intense psychological assistance, both in the classroom and outside, to prevent the children's accompanying and significant behavioral problems from substantially interfering with their ability to learn.

### b. *Damages*

Plaintiffs seek both compensatory and punitive damages arising out of defendants' refusal to fund residential placement for Colin and Alan at Landmark School during the 1979–80 school year. Because damages under the EAHCA are unavailable in this

---

**16.** The Court expresses no opinion on exactly what pupil/teacher ratio is appropriate under the EAHCA. However, the Court notes that the Regulations of the Rhode Island Board of Regents for Education concerning Education for Handicapped Children § 3(II) (2.1.1) (1980) provide that the "[m]aximum class size for severely, profoundly, and multi-handicapped children shall not exceed six ... children ...." Furthermore, at Lab School, where Alan and

Colin slowly but steadily progressed, Alan's IEP for 1979–80 called for a small class of nine students taught by a certified special education teacher and two aides. Of course, these boys' unique needs may require a ratio even lower than that at Lab or as set by the Rhode Island regulations.

**17.** *See* note 8 *supra.*

case, plaintiffs pursue their damages remedy under § 504 of the RHA and under 42 U.S.C. § 1983 for an alleged violation of the equal protection clause.[18] The Court finds that plaintiffs are not entitled to damages for defendants' failure to provide a residential placement during the 1979–80 school year.

■ First, plaintiffs' claim for damages under § 504 of the RHA is unmeritorious because *in no case* could a school system's failure to provide a private, residential placement constitute a violation of the RHA. It is true that the regulations promulgated under the RHA insure a "free appropriate education" to handicapped children just as the EAHCA does. 45 C.F.R. § 84.33(a) (1981). Moreover, at least under the EAHCA, "a free appropriate education" may in some cases require residential placements. However, as this Court noted recently in *Turillo v. Tyson*, 535 F.2d 577 (D.R.I.1982), the Supreme Court in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), has interpreted narrowly the scope of § 504. The Court in *Davis* held that § 504 does not impose "affirmative obligations" on recipients of federal funds and does not require "undue" financial or administrative burdens. *Id.* at 410–12, 99 S.Ct. at 2369. In *Turillo*, this Court established a two-tier analysis for § 504 cases after *Davis*. First, § 504 only requires recipients of federal funds to make accessible to handicapped persons the same services, programs, and facilities to which non-handicapped individuals have access. *Turillo v. Tyson, supra*, at 587. Second, if the relief requested under the RHA satisfies this first tier, it is still not mandated by § 504 if its implementation would require undue financial or administrative burdens. *Id.* at 587–588.

Thus, although an implied private right of action exists to enforce the RHA, *id.* at 584, and even though damages are probably available under the Act, *see, e.g., Miener v. State of Missouri*, 673 F.2d 969, 979 (8th Cir. 1982); *Campbell v. Talladega Cty. Bd. of Educ.*, 518 F.Supp. 47, 56–57 (N.D.Ala.1981)

(dicta); *Hutchings v. Eric City and County Library Bd. of Directors*, 516 F.Supp. 1265, 1268–69 (W.D.Pa.1981); *Patton v. Dumpson*, 498 F.Supp. 933, 937–39 (S.D.N.Y.1980); *Poole v. South Plainfield Bd. of Educ.*, 490 F.Supp. 948, 949 (D.N.J.1980); *contra Boxall v. Sequoia Union High School*, 464 F.Supp. 1104, 1112 (N.D.Cal.1979) (dicta), MSC's refusal to fund a residential placement could not possibly violate the RHA and entitle plaintiffs to damages. Funding a residential placement would constitute affirmative conduct making available to handicapped children facilities and programs not available to non-handicapped students, thus not satisfying the first tier of the RHA test. *Turillo v. Tyson, supra*, at 587.

■ Plaintiffs' equal protection claim for damages must also fail. The plaintiffs have not fully briefed this claim, mentioning it only cursorily in their recent memoranda to this Court. However, Plaintiffs' Memorandum on the Availability of Damages, filed on March 3, 1982, states that defendants' violation of the equal protection clause "was the inevitable result of the Middletown Defendants' ... policy or practice of placing all primarily learning disabled students in self-contained public classrooms .... Only students suffering from [other] handicapping conditions ... received any consideration for an outside placement." *Id.* at 1. The Court thus assumes that plaintiffs are contending that defendants violated the equal protection clause by discriminating on the basis of different types of handicapping conditions with respect to funding of residential placements.

Because education is not a fundamental right, *San Antonio Ind. School District v. Rodriguez*, 411 U.S. 1, 44, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16 (1973); *Sandlin v. Johnson*, 643 F.2d 1027, 1029 (4th Cir. 1981); *Guadalupe Organization, Inc. v. Tempe Elem. School District*, 587 F.2d 1022, 1026 (9th Cir. 1978), and because handicapped children do not constitute a suspect class, *Sherer v. Waier*, 457 F.Supp. 1039, 1048 (W.D.Mo.1978); *Doe v. Koger*, 480 F.Supp. 225, 230 (N.D.Ind.1979) ("seriously doubts"

---

18. *See* note 6 *supra*.

that mentally handicapped students constitute suspect class), MSC's alleged "policy or practice" needs only pass the "rational basis" level of equal protection scrutiny. For purposes of plaintiffs' motion for summary judgment, the Court will assume that defendants do not consider learning disabled children for residential placements. Indeed, the record indicates that such a policy exists. *See* Tr. CC at 60–71 (Feb. 6, 1980) (testimony of O. William Hilton). However, MSC's alleged policy of providing residential placement for visually and emotionally handicapped children, *see id.* at 63, but not for learning disabled students like the plaintiffs, is not so arbitrary and irrational as to violate the equal protection clause. It is undisputed that defendants believe that the public system can provide an appropriate education for all learning disabled children. *See id.* at 60 (testimony of O. William Hilton) ("We have appropriate [learning disability] programs within the system.").[19] Although this belief may be erroneous, it is not wholly irrational. It is not irrational to believe that sufficiently intense non-residential programs within self-contained classrooms could adequately educate students whose primary disabilities are

not emotional, visual, or behavioral. In sum, plaintiffs are not entitled to damages under either the RHA or under the equal protection clause and § 1983 for MSC's failure to fund residential placement for Colin and Alan during the 1979–80 school year.[20]

## CONCLUSION

Plaintiffs' motion for summary judgment is hereby granted in part and denied in part. Plaintiffs' requests for damages are hereby denied. However, MSC is ordered to continue funding the children's placement at Landmark, which currently provides at least an appropriate education, until such time as MSC and NCRSEP propose an alternative placement that is determined to provide a free appropriate public education. Any new proposals must comply with the safeguards in 20 U.S.C. § 1415(b)(1), and plaintiffs will have the opportunity to challenge such proposals in the state administrative process. *Id.* § 1415(b), (c).[21]

---

19. The Court notes that MSC apparently *does* provide day school placements outside of the Middletown system for learning disabled children. Tr. CC at 60–61 (Feb. 6, 1980) (testimony of O. William Hilton).

20. The Court notes that plaintiffs are not entitled to damages under § 1983 for violations of the EAHCA. *Turillo v. Tyson*, 535 F.2d 577, 580–581 (D.R.I.1982). Congress intended the comprehensive remedial scheme of the EAHCA

to foreclose relief under § 1983 for violations of the Act. *Id.*

21. Plaintiffs request attorney's fees in this litigation. However, neither party has fully briefed the issue of availability of fees. The Court will thus not address this issue at this time, and directs the parties' attention to *Turillo v. Tyson*, 535 F.2d 577 (D.R.I.1982), in which the Court discussed availability of fees under the EAHCA, RHA, and 42 U.S.C. § 1988.