**NORTON SCHOOL COMMITTEE,**
Plaintiff,

v.

**MASSACHUSETTS DEPARTMENT OF EDUCATION, Nancy H. and Steven P., Defendants.**

Civ. A. No. 90–10755–C.

United States District Court,
D. Massachusetts.

July 1, 1991.

Maureen A. Lee, Law Offices of John P. Lee, Attleboro, Mass., for Norton School Committee.

Donna L. Palermino, Asst. Atty. Gen., Boston, Mass., for Massachusetts Dept. of Educ.

R. Lisa DiLuna, Woburn, Mass., Francis A. DiLuna, Roche, Carens & DeGiacomo, Woburn, Mass., for Nancy H., Hamilton and Steven P.

## MEMORANDUM

CAFFREY, Senior District Judge.

This action was initiated pursuant to the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400, *et seq.* (1990), by plaintiff, the Norton School Committee ("Norton") against the Massachusetts Department of Education, Steven P. and Nancy H. (collectively "defendants"). Steven P. is the child whose special needs are at issue. Nancy H. is his mother. Norton's complaint, filed in accordance with the civil action provision of the EHA, challenges the final decision of the Department of Education's Bureau of Special Education Appeals ("BSEA") rendered in favor of the defendants, and ordering reimbursement to Nancy H. for two school years. Nancy H. has counterclaimed to recover reasonable attorneys' fees and costs in the event she prevails. For the reasons discussed below, defendants' motion for summary judgment against plaintiff's claim should be granted as to the portion of the BSEA decision concerning the 1988–89 school year, but denied as to the 1989–90 school year. The motion for summary judgment of Mrs. H. and Steven P. for attorneys' fees and costs should be denied. Finally, plaintiff's motion to submit additional evidence should be allowed.

### I.

#### A. The Education of the Handicapped Act

The specifics of this case and of Steven's educational needs cannot be addressed without first examining the EHA itself. The EHA sets up a complicated scheme where, by meeting certain requirements, states will receive funds with which to provide all handicapped children with "free appropriate education." 20 U.S.C. § 1415(a) (1990). The Supreme Court has stated that a "free appropriate education" means "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. v. Rowley,* 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).

In creating the EHA, Congress recognized the traditional role of the states in formulating education policy. *Rowley,* 458 U.S. at 208 n. 30, 102 S.Ct. at 3051 n. 30. The scheme set up by the EHA, therefore, implicates fundamental principles of state/federal relations, and has been described as "cooperative federalism." *Burlington v. Department of Educ.,* 736 F.2d 773, 783 (1st Cir.1984), *aff'd,* 471 U.S. 359,

105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In accordance with principles of "cooperative federalism," the Supreme Court has cautioned federal courts against imposing their views concerning education on the states. *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. The EHA establishes the minimum requirements, or floor, that states must meet, but states may exceed that federal minimum. *Burlington*, 736 F.2d at 789. Thus, the EHA incorporates by reference state standards that exceed the federal floor. *Id.*

Massachusetts is an example of a state that has chosen to offer more, both substantively and procedurally, to the education of handicapped children. *Roland M. v. Concord School Comm.*, 910 F.2d 983, 987 (1st Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Under the law of Massachusetts, the goal is "to assure the maximum possible development in the least restrictive environment of a child with special needs." Mass.Gen.L.Ann. ch. 71B, § 2 (West Supp. 1991). Under both Massachusetts and federal law, however, there is imposed the so-called "mainstreaming" requirement. *See* 20 U.S.C. § 1412(5) (1990). Mainstreaming simply means that, to the extent appropriate, handicapped children should be educated with children who are not handicapped. *Id.; Roland M.*, 910 F.2d at 987. Put another way, the handicapped child must be educated in the least restrictive environment. *David D. v. Dartmouth School Comm.*, 775 F.2d 411, 423 (1st Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986).

In addition to the substantive requirements mandated by the EHA, there are certain procedural safeguards regarding the provision of "free appropriate education." 20 U.S.C. § 1415(a) (1990); *Roland M.*, 910 F.2d at 987. The principle procedural safeguard, and the main focus of the current action, is the Individualized Education Program or IEP. *See* 20 U.S.C. §§ 1401(19) & 1414(a)(5) (1990). The IEP is so critical to the EHA that it has been termed "the key operative feature of the federal Act." *David D.*, 775 F.2d at 415. An IEP is a written statement developed to meet the distinct needs of a handicapped child. 20 U.S.C. § 1401(19) (1990). The IEP is developed at a "team" meeting by a group of individuals, namely, a representative of the appropriate state or local agency, the child's teacher, the child's parents, and, where appropriate, the child himself. *Id.* According to the statute, the IEP must contain, among other things, a statement of the child's present level of educational performance, a statement of annual goals, a statement of the specific services to be provided to the child, and a statement of the evaluation process to be conducted in the future. *Id.* In addition, the EHA requires that the IEP be reviewed and, if necessary, revised, no less than annually. 20 U.S.C. § 1414(a)(6) (1990).

In keeping with the EHA's focus on parental involvement, parents must be notified of any proposed change in the IEP. *See* 20 U.S.C. § 1415(b)(1)(D) (1990); Mass. Gen.L.Ann. ch. 71B, § 3 (West 1982). If the parents reject the IEP, the EHA provides that they are entitled to "an impartial due process hearing." 20 U.S.C. § 1415(b)(2) (1990). In Massachusetts, this hearing is conducted by the BSEA. The BSEA determination is reviewable by the dissatisfied party in either state or federal court. 20 U.S.C. § 1415(e)(2) (1990). In conducting a review of a BSEA decision, a court has a two-part inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

## B. Standard of Review

■ The appropriate standard of review to be conducted by the trial court has received much attention and has been described as "obscured." *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990). The EHA states that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the

evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2) (1990). The Supreme Court has explained that the many procedural requirements involved in developing the IEP would be frustrated if a court could overturn state decisions "at nought." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. Thus, this Court must give "due weight" to the BSEA determination. *Id.* Furthermore, the "additional" evidence to be heard by the Court should be limited, the primary focus being on the record from the administrative hearing. *See Burlington*, 736 F.2d at 790. The First Circuit has described this review process as "something short of a trial *de novo.*" *G.D. v. Westmoreland School Dist.*, 930 F.2d 942, 945 (1st Cir. 1991) (quoting *Colin K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983)). In sum, this Court "must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole." *Burlington*, 736 F.2d at 792.

■ This standard must be applied against the traditional summary judgment standard. The principal motion to be addressed is that by defendants for summary judgment on plaintiff's claim brought under 20 U.S.C. § 1415(e)(2) (1990). Summary judgment procedure is proper even in the context of the EHA. *Victoria L. By Carol A. v. District School Bd.*, 741 F.2d 369, 372 (11th Cir.1984); *Bertolucci v. San Carlos Elementary School Dist.*, 721 F.Supp. 1150, 1153 (N.D.Cal.1989); *Barwacz v. Michigan Dep't of Educ.*, 674 F.Supp. 1296, 1301 (W.D.Mich.1987); *see Westmoreland School Dist.*, 930 F.2d at 946. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celo-*

*tex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). One way of meeting this burden is by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2553. Once he or she has done so, the opposing party must come forward with enough evidence to demonstrate that there is a genuine issue of material fact for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. To determine if a dispute is genuine, a court must ask whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court will examine the facts against this standard.

## II.

Steven P. is currently 17 years old. It is undisputed that Steven is a student with special educational needs within the meaning of state and federal law. Steven has a history of speech, language and other learning problems. His special needs were apparent from the time he was young. Mrs. H. first became concerned about Steven's development when, at approximately one year of age, he was not speaking or attempting to put sounds together. Thus, when Steven was one and a half years old, his mother arranged for an evaluation at Children's Hospital. (Parents' Exhibit 3). Based on this evaluation, and at the request of his mother, Mrs. H., Steven received speech therapy, and received a core evaluation by the Norton public schools at the age of three.

Steven repeated his first year of elementary school, and through fifth grade, received special needs services under what is called a "502.2 prototype." The 502.2 prototype means that Steven did not spend more than 24% of the school week outside of the regular class room in special education.[1] Although Mrs. H. believed that

---

1. Paragraph 502.2(a) states:
 The child shall be removed from the regular education program and classroom to receive

 any of the services listed in ¶ 503.1 which the TEAM specifies should be provided to the

Steven was progressing adequately, she grew concerned at the end of his fifth grade year upon seeing the results of his standardized testing. (Testimony of Mrs. H., Tr. at 29, Oct. 20, 1989). The test administered in the fifth grade demonstrated a deficiency in reading and language skills, placing him at a second to third grade level in these areas. (Parents' Exhibit 46).

By sixth grade, Steven's grades began to decline. He received several "Ds" and did not receive a grade higher than a "C" except in physical education. (Parents' Exhibit 45). At the end of Steven's sixth grade year, at the team meeting to plan the IEP for seventh grade, Mrs. H. expressed her concern regarding Steven's declining academic performance. (Testimony of Mrs. H., Tr. at 35, Oct. 20, 1989). It was recommended at the meeting that Steven's speech therapy should be reduced, given Steven's poor attitude toward it and his lack of progress. In addition, at that same team meeting, Steven's guidance counselor recommended psychological counseling for Steven. It was. Steven's counselor, Dr. Svajian, who recommended that Steven undergo a full evaluation at the Kennedy Memorial Hospital ("KMH") in order to understand the full extent of Steven's learning problems. (Testimony of Mrs. H., Tr. at 39, Oct. 20, 1989).

Some time after this May, 1987, team meeting, Norton presented Mrs. H. with Steven's IEP for his seventh grade year, the 1987–88 school year. (Parents' Exhibit 33). This IEP was listed as a 502.1 prototype, which offered less by way of special needs education than the 502.2 prototype that Steven had received in the past.[2] Under this IEP, Steven's special needs services consisted of two fifteen minute periods per week where his regular education classwork would be monitored by a re-

source room teacher. Mrs. H. postponed the decision of whether to accept or reject this IEP until after the KMH evaluation, which was conducted in part over the summer, and completed in September, 1987. During September, Norton conducted its own evaluation at approximately the same time, arriving at similar test results.

The KMH evaluation played a key role at the BSEA hearing, and therefore, must be described in some detail. Dr. Howell summarized his evaluation as follows:

> [Steven] has moderate to severe speech disarticulation and a significant reading and language disability. He has significant difficulty with pencil control which may be a manifestation of underlying visual/motor perceptual difficulties or a reflection of his primary motor awkwardness. He has been identified in the past as having poor motor planning skills. In addition to the above findings, his past history very much points to a primary attention deficit disorder with hyperactivity as well. Testing today reveals a degree of inattentiveness and impulsiveness which inconsistently interferes with performance.

(Parents' Exhibit 14). The evaluation did show, however, that Steven scored high in math. The KMH evaluation also made several recommendations, which will be set forth below in the context of the BSEA decision. Significantly, the KMH report remarked that "[i]t is possible that Norton Middle School may not be able to provide all of Steven's needs. In that case, other resources may be needed, which may be available through other facilities within the public school system." (Parents' Exhibit 14 at 7).

A new IEP was developed in October, 1987, and was designated as a 502.3 prototype. This IEP provided for academic sup-

child outside the regular education classroom; provided, however, that the child shall not be removed from the regular education classroom for more than 25% of the class time of each school day.
Mass.Regs.Code, tit. 603, § 28, ¶ 502.2 (1986).

**2.** Paragraph 502.1(a) states in relevant part that, "[e]xcept to the extent both permitted and re-

quired by the provisions of ¶ 502.1(b), the child shall not leave such regular education program and shall be treated no differently than the other children in such program." Mass.Regs. Code tit. 603, § 28, ¶ 502.2 (1986).

port three periods per week, typing twice per week, and language therapy twice per week. (School's Exhibit 3). Perceiving that Norton was not implementing the recommendations of KMH, Mrs. H. rejected the new IEP on October 21, 1987. Various modifications were proposed over the course of Steven's seventh grade year, some which were accepted and some which were rejected. Eventually, an agreement was reached by way of mediation. (School's Exhibit 23).

Despite the mediated agreement, Mrs. H. was still concerned about the adequacy of Steven's educational program. During the summer, Mrs. H. had consulted with Janet Sylvia, an advocate associated with the Office For Children. Ms. Sylvia, in fact, had attended the October 5, 1987, team meeting held to reevaluate Steven's IEP, and had recommended to Mrs. H. that she consider placing Steven in a private facility. Given her continuing concern about Steven's educational program, Mrs. H. again consulted Ms. Sylvia, who recommended that Mrs. H. retain an expert educational consultant. Marsha Stevens was retained, and after reviewing Steven's file, and visiting Norton, concluded that Norton's program was inappropriate to meet Steven's needs. Consequently, in the spring of 1988, Mrs. H. began inquiring about private special needs schools, primarily the Landmark School and the Carroll School. She learned through her inquiries that the Carroll School, which was a one and a half hour drive from her home, was full for the 1988–89 school year.

In June, 1988, Norton proposed Steven's IEP for the 1988–89 school year. This IEP was designated as a 502.3 prototype, and would have provided Steven with five hours and fifteen minutes of special education per week. (Parents' Exhibit 38). Mrs. H. rejected that IEP on July 21, 1988. In the fall, September 1988, Steven was enrolled at the Landmark School's North campus, which is Landmark's equivalent of a middle school. The South campus is Landmark's equivalent of the high school level. Subsequently, in January, 1989, a meeting was held to resolve the unsettled problems. In attendance were Steven's

parents, their attorney, Norton representatives, Norton's attorney, and Ms. Sylvia. The parents' attorney set forth nine issues to be addressed, and Norton made counterproposals, but no agreement was reached. (School's Exhibit 22).

Five months later, on September 7, 1989, Norton held a team meeting regarding the IEP to be proposed for the 1989–90 school year. It is undisputed that neither the parents nor Steven was invited to this team meeting. (Testimony of Mrs. H., Tr. at 62, Oct. 20, 1989). Likewise, the parents were not asked for their input in the development of the 1989–90 IEP. When Norton finally presented the IEP, classes at Norton had already begun, as had classes at Landmark South. (Testimony of Marsha Stevens, Tr. at 160, Nov. 1, 1989). That IEP was listed as 502.2 prototype. (Parents' Exhibit 75). After requesting that Ms. Stevens evaluate Norton's proposal and the program at Landmark South, Steven's parents rejected the 1989–90 IEP on October 16, 1989.

The BSEA conducted a five day hearing from October 30, 1989 to November 3, 1989, concerning the parents' rejection of the 1988–89 and 1989–90 IEPS. In the course of that hearing, the hearing officer heard from thirteen witnesses, and accepted 121 exhibits. The decision was rendered in favor of the defendants. Specifically, the hearing officer found Norton's IEPs for 1988–89 and 1989–90 to have been inappropriate, and the programs offered by Landmark for the same years to have been appropriate. Furthermore, the hearing officer concluded that Norton had violated several procedural requirements of state and federal law. Norton was therefore ordered to fund Steven's 1988–89 and 1989–90 years at Landmark. (BSEA Exhibit 11, Vol. V, at 904). In the current action, Norton contests the BSEA decision.

### III.

The ultimate question regarding both years is whether Steven's parents are entitled to reimbursement for Landmark's tuition. When a school fails to provide a child

with an appropriate education under the EHA, this Court is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2) (1990). It is well settled that among the options available to a court under the EHA is the option of reimbursing the parents for funds expended on private education. *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). The rationale for allowing reimbursement is that a town should be required to pay for that education which it should have been providing all along. *Id.* at 370–71, 105 S.Ct. at 2002–03.

■ Parents are not automatically barred from receiving reimbursement simply by virtue of their unilateral decision to change their child's school during the pendency of the placement review. *Id.*, at 370, 105 S.Ct. at 2002; *Roland M.*, 910 F.2d at 1000. Rather, reimbursement may be recovered by a party who prevails at the end of a placement dispute. *Roland M.*, 910 F.2d at 999. Two requirements must be met, however, in order for parents to be entitled to reimbursement. *School Comm. of Burlington*, 471 U.S. at 370, 105 S.Ct. at 2002; *Roland M.*, 910 F.2d at 1000. First, it must be demonstrated that the school's proposed IEP was inappropriate to meet the student's educational needs. *Roland M.*, 910 F.2d at 1000. Second, even if the parents show that the IEP was inappropriate, they must still demonstrate that their placement was appropriate. *Id.*

■ These two requirements cannot be viewed in a vacuum, and a school's failure to provide an appropriate education should be considered when determining if the parents' placement for the child was appropriate. *Tice v. Botetourt County School Bd.*, 908 F.2d 1200, 1208 n. 11 (4th Cir.1990); *see McKenzie v. Smith*, 771 F.2d 1527, 1535 (D.C.Cir.1985) (school's failure to follow EHA taken into consideration in evaluating parent's choice of placement); *Colin K. v. Schmidt*, 536 F.Supp. 1375, 1386 (D.R.I.1982) (reimbursement allowed where parents' placement appropriate, even though court could not say from the record

if parents' placement was minimally necessary), *aff'd*, 715 F.2d 1 (1st Cir.1983). As explained by one court, "[t]he *Burlington* rule is not so narrow as to permit reimbursement only when the interim placement chosen by the parent is found to be the exact proper placement required under the Act." *Alamo Heights, Indep. School Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir.1986). Consequently, it is appropriate to order reimbursement for the parents' placement where, based on what appears in the record, it was the most appropriate school. *McKenzie*, 771 F.2d at 1535.

■ In the analysis portion of his decision, the hearing officer chose to discuss the two years together. This Court finds it more appropriate to examine the hearing officer's decision as to each year individually, turning first to the 1988–89 year. Applying the principles discussed above, the first material issue to be addressed is the hearing officer's conclusion that Norton's IEP for that year was inappropriate to address Steven's special education needs so as to assure his maximum possible educational development in the least restrictive environment. Norton's IEP for 1988–89 was designated by Norton as a 502.3 prototype. (Parents' Exhibit 38). As mentioned above, this IEP provided for 5.25 hours per week of special needs services. This included five periods per week of reading support, one period per day. In addition, Steven would receive two periods per week of academic support. As its name suggests, during the academic support periods, Steven would be given support for his mainstream classes. (Testimony of Roberta Friedman, Tr. at 23, Nov. 3, 1990). These sessions would have taken place in the resource room with anywhere from five to ten other students, depending on the day of the week. (Testimony of Roberta Friedman, Tr. at 63–65 Nov. 3, 1990). These special services would have been provided by Ms. Friedman, a special needs resource room teacher at Norton. Mrs. Friedman testified that when Steven did not have work or assignments for his mainstream classes, he would have worked on his areas

of weakness, such as handwriting. (Testimony of Roberta Friedman, Tr. at 24, Nov. 3, 1990).

Other than these special services, Steven would spend the remainder of each school week in regular education classes. These regular education classes were as follows: remedial reading, five periods per week with nineteen students; specials (cooking or shop), five periods per week with approximately fifteen students; remedial english, five periods per week with approximately 17 students; math, five periods per week; science, five periods per week, with approximately twenty students; computer, one period per week with twenty students. (Testimony of Roberta Friedman, Tr. at 16–24, 56–65, Nov. 3, 1990).

The hearing officer correctly determined that this program, as set forth in the 1988–89 IEP, was inappropriate. Norton has failed to raise a genuine issue of material fact as to this determination. In reaching his conclusion, the hearing officer relied heavily on Norton's failure to implement the recommendations of KMH. (*See* BSEA Exhibit 11, at 895). The hearing officer noted that Norton had not attempted to attack the validity of the KMH evaluation, and therefore, that those findings stood unrebutted. (*See* BSEA Exhibit 11, at 894). Norton contests the unrebutted status of the KMH evaluation in its memorandum. (*See* Plaintiff's Memorandum in Opposition, at 6). This belated attempt to draw into question the KMH study must be rejected. Far from repudiating KMH, it is clear from this Court's careful reading of the hearing transcript that Norton repeatedly relied upon and endorsed KMH's evaluation. (*See* Testimony of Mary Ann Zern, Tr. at 40, Nov. 1, 1989; Testimony of Patricia Kalicki, Tr. at 300–01, Nov. 2, 1989; Testimony of Roberta Friedman, Tr. at 65, 66, Nov. 3, 1989; Testimony of Elizabeth Dziejma, Tr. at 110, Nov. 3, 1989). Consequently, there is no question that the hearing officer was correct in using KMH's recommendations as measuring stick of what was an appropriate education for Steven.

Thus, although lengthy, some of the specifics of KMH's recommendations must be examined and compared with Norton's 1988–89 IEP. First, KMH recommended "placement in a small, substantially separate classroom for learning disabled children." (Parents' Exhibit 14). This setting should be composed of children with disabilities similar to Steven's, but with no behavioral disorders. Second, KMH recommended that within this setting, Steven receive individualized reading on a one to one, or small group basis, by a reading or learning disabilities specialist. KMH suggested that Steven receive two periods per day targeted at reading and expressive language. Third, KMH recommended an advanced math class, given his strong math skills. Fourth, the evaluation recommended teaching Steven typing and word processing skills. KMH also recommended regular sessions with the school counselor in order to build his self-esteem. Finally, as an alternative to a self-contained classroom, the KMH suggested that a 502.3 "program could be acceptable if the above-outlined approach could be incorporated into his educational plan."

Mindful of the deference owed to the BSEA findings, this Court holds that the hearing officer correctly determined that Norton's 1988–89 IEP did not sufficiently implement KMH's recommendations, and was inappropriate to meet Steven's special educational needs. The hearing officer concluded that KMH, in advocating a self-contained classroom, was proposing a 502.4 prototype.[3] In construing the facts in the light most favorable to Norton, this Court will assume that, in accordance with KMH's recommendation, a 502.3 prototype might have been sufficient. Even in this light, however, the 1988–89 prototype was

---

**3.** Paragraph 502.4 reads, in part: Programs within this prototype shall have the following characteristics:

502.4(a) The child shall be assigned to a program or programs made up entirely of children in need of special education.

502.4(b) In each program the number of children for each teacher shall not exceed eight, and for each teacher with an aide, shall not exceed twelve.

Mass.Regs.Code tit. 603, § 28, ¶ 502.2 (1986).

inappropriate. Although the IEP was designated as a 502.3 prototype, it is clear that what Norton proposed fell within the category of a 502.2 prototype, given that it proposed only 5¼ hours each week of special education. Norton's own witness, Roberta Friedman, testified in response to the hearing officer's question that the 1988–89 plan was "probably a [502.2]." (Testimony of Roberta Friedman, Tr. at 80, Nov. 3, 1989).

Even apart from the technical issue of which prototype was being offered for Steven's eighth grade year, it is clear that the IEP fell far short of meeting Steven's needs. As the BSEA decision stated, Norton never came close. The decision concluded, and the record demonstrates, that Steven was performing anywhere from 2½ to 5 years below his grade level in reading and language based skills. Thus, although he desperately required specific, individualized attention to these deficient areas, Norton simply proposed services to support and supplement his regular education classes. Finally, as noted by the hearing officer, and exemplified through Steven's results on the Stanford Diagnostic Reading test administered by Norton, the gap between Steven's actual grade level and his grade level performance was continually increasing. In sum, this Court's review of the hearing and the exhibits confirms the BSEA's conclusion that the 1988–89 IEP was inappropriate. Plaintiff had ample opportunity at the extensive BSEA hearing to dispute this conclusion, and has failed to raise a genuine issue of material fact.

■ This Court must next turn to the question of whether the parents' decision to enroll Steven in Landmark North for the 1988–89 year was appropriate, such that the parents would be entitled to reimbursement for the 1988–89 school year. Landmark North is roughly the equivalent of a middle school, and in the 1988–89 school year, had 66 students. (Testimony of Karl Pulkkinen, Tr. at 154–55, Oct. 30, 1989). The age of the students at the North campus ranges from nine to fifteen. To be eligible for admission to Landmark, a student must have average to above average intellectual potential. (Testimony of Karl Pulkkinen, Tr. at 154–55, Oct. 30, 1989). The program at Landmark North is a highly individualized and small group program designed to focus on the student's needs, especially in the area of reading and language arts. The classes are grouped not by age or grade, but rather, by level of skill or needs. Although many of Landmark's teachers are not certified in moderate special needs, Landmark is accredited by the Massachusetts Office for Children, the New England Association of Secondary Schools and Colleges, and the Massachusetts Department of Education.

Steven's 1988–89 program at Landmark North was language-based. His schedule for the fall and spring semesters are set forth in Parents' Exhibit 56. For the fall, Steven's program, and student to teacher ratio, was as follows: auditory-oral expression, 7:1; language arts, 5:1; small engine repair, 4:1; math, 4:1; tutorial, 1:1; physical education, 11:1; and, life science, 7:1. Additionally, Steven voluntarily received one period of speech therapy each week. The approach taken in this period was described at the hearing as "collaborative reading," whereby Steven and his instructor would take turns reading from a book. (Testimony of Charles Haynes, Tr. at 203, Oct. 31, 1989). This approach was meant to overcome Steven's aversion to speech therapy. Steven's spring program consisted of: auditory-oral expression, 6:1; Math, 6:1; woodworking, 5:1; language arts, 5:1; physical education, 14:1; tutorial, 1:1; and, life science, 6:1. As in the fall, Steven continued with one period each week of language therapy with Mr. Haynes. (Parents' Exhibit 56).

The BSEA conclusion that the Landmark North program outlined above was appropriate to meet Steven's needs is clearly warranted by a preponderance of the evidence produced at the hearing. Likewise, the plaintiff had more than enough opportunity to present its own evidence at that time, and cannot avoid summary judgment via that route. *See Roland M.,* 910 F.2d at 997. The record is replete with exhibits documenting Steven's success at Landmark North during the 1988–89 year. The low

student to teacher ratios embodied in Landmark's 1988–89 program clearly implemented the KMH recommendation that Steven be taught in a substantially separate classroom with other children with similar disabilities. Likewise, at Landmark, unlike Norton, Steven was instructed in, and began to use, cursive writing. (Testimony of Marsha Stevens, Tr. at 136, Nov. 1, 1989). It also appears from the Gray and Oral reading tests administered in September 1988, and again in September 1989, that Steven made almost one year's progress in oral reading. (Parents' Exhibit 78; Testimony of Suzanne Crossman, Tr. 145, Oct. 31, 1989).[4] This contrasted with the incremental improvement he had been undergoing at Norton. Likewise, Sandra Nadeau testified that Steven had made significant progress in spelling. (Testimony of Sandra Nadeau, Tr. at 62, Oct. 31, 1989).

To be sure, the academically superior school is not automatically the appropriate placement under the EHA, given the acts emphasis on mainstreaming. *Roland M.*, 910 F.2d at 992. Likewise, as the BSEA found, the 502.6 residential placement at Landmark was more restrictive than would optimally be necessary for Steven as it did not provide the mainstreaming required under the EHA. The First Circuit has held, however, that "the least restrictive environment guarantee ... cannot be applied to cure an otherwise inappropriate placement...." *Burlington*, 736 F.2d at 789 n. 19. Thus, as the BSEA concluded, faced with the clearly inappropriate IEP proposed for the 1988–89 year, "Steven's 502.6 residential placement at Landmark by Parent was the only viable option open to her." (BSEA Exhibit 11, at 902). Moreover, as discussed above, it is not necessary for a parent, when faced with a pressured decision of where to place her child, to seek out

the perfect alternative placement. *Alamo Heights Indep. School Dist.*, 790 F.2d at 1161. The testimony stands unrebutted that the Carroll school was at full enrollment for the 1988–89 year. Norton had ample opportunity at the BSEA hearing to demonstrate that there were more appropriate, less restrictive, placements available for Steven, yet came up with none. Thus, having reviewed the extensive record, and giving "due weight" to the state agency, it is apparent that the BSEA was correct in its determination that Landmark North was an appropriate placement.[5] Consequently, Mrs. H. should receive reimbursement for tuition and related expenses for the 1988–89 year.

■ In contrast, the 1989–90 year is not ripe for summary judgment. At the time the hearing was held in late October, 1989, the 1989–90 school year had only just begun. There was testimony by Marsha Stevens, the parents' educational consultant, that the 1989–90 program at Landmark South was appropriate, and Norton's was not. (Testimony of Marsha Stevens, Tr. at 183, Nov. 1, 1989). Significantly, however, Stevens visited Landmark South on the first day of classes. By her own testimony, this was a "very tough day to observe." (Testimony of Marsha Stevens, Tr. at 106, Nov. 2, 1989). In addition, it is important that Steven's 1989–90 year was at Landmark *South*, Landmark's "high school" campus. This change in campus and in programs should be explored at trial. Given that the 1989–90 years at both Norton and Landmark had just begun at the time of the hearing, additional evidence will be heard at trial to determine what was an appropriate placement for the 1989–90 year. This evidence will then be examined in light of the evidence already produced

4. There was testimony concerning the validity of Landmark's Stanford Achievement Test results. (*See* Testimony of Roberta Friedman, Tr. at 51, Nov. 3, 1989). Given that this is a summary judgment motion, this Court will assume that the results of this test are invalid and entitled to no weight.

5. Like the BSEA, this Court is not overly concerned with the fact that many of Landmark's

teachers were not certified. Any lack of credentials is more than compensated for by the level of attention Steven received, the low student to teacher ratio, and the intensive training received by Landmark's experienced staff. Norton's argument to the contrary seems disingenuous at best, given that Norton itself has funded public placements at Landmark.

concerning Norton's procedural violations in developing the 1989–90 IEP.

This Court will not, at this point, categorically exclude all evidence concerning the 1990–91 school year. This is, however an appropriate time to emphasize that the Court will not allow the parties to repeat or embellish testimony already given to the hearing officer. *See Town of Burlington,* 736 F.2d at 790. This Court will strictly limit the evidence to that which the parties have not yet had the opportunity to provide. With this cautionary word in mind, plaintiff's motion to submit additional evidence should be allowed.

■ The last issue to be addressed is the motion by Mrs. H. and Steven P. for summary judgment on their counterclaim seeking attorneys' fees and costs. The EHA provides that "[i]n any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a handicapped child or youth who is the prevailing party." 20 U.S.C. § 1415(e)(4)(A) (1990). The total amount of costs sought by Mrs. H., an amount which includes the fee of her educational expert, Marsha Stevens, is $53,-544.50. This Court declines defendants' request to award costs at this point, and will instead reserve this issue until the completion of the trial.

For all of the reasons stated above, the motion of all three defendants for summary judgment should be allowed as to the 1988–89 school year, and denied as to the 1989–90 school year. As a practical matter, this leaves the Massachusetts Department of Education's position in this suit unaffected; therefore, the Court's order shall indicate that its motion was denied. The motions for summary judgment for attorneys' fees by Mrs. H. and Steven P. should be denied. Plaintiff's motion to submit additional evidence should be allowed.

Order accordingly.