In the Matter of BOARD OF EDU-
CATION, SACRAMENTO CITY UNI-
FIED SCHOOL DISTRICT, Plaintiff,

v.

Rachel HOLLAND, By and Through her
Guardian Ad Litem, Robert HOL-
LAND; William Honig, California
State Superintendent of Public Instruc-
tion; California State Department of
Education Hearing Office, McGeorge
School of Law; and Mary Cote, Hear-
ing Officer, Defendants.

Civ. No. S-90-1171-DFL.

United States District Court,
E.D. California.

March 2, 1992.

Jane E. Slenkovich, Phoebe Graubard, Keith L. Slenkovich, Law Office of Jane E. Slenkovich, Saratoga, Cal., Steven Royston, Dist. Legal Counsel, Sacramento City Unified School Dist., for plaintiff Board of Educ., Sacramento City Unified School Dist.

Joseph R. Symkowick, General Counsel, Roger D. Wolfertz, Asst. Gen. Counsel, Barry Zolotar, Deputy General Counsel, Joyce O. Eckrem, California Dept. of Educ., Sacramento, Cal., for State Educ. defendants.

Sidney Wolinsky, Diane J. Lipton, Disability Rights Educ. and Defense Fund, Kathryn E. Dobel, Berkeley, Cal., for defendants.

## ORDER

LEVI, District Judge.

Defendant Rachel Holland is a nine year old girl who is moderately mentally retarded. She has an I.Q. of 44 and on academic testing functions at about the level of a four year old child. She is well behaved and popular with her second grade classmates. She enjoys school and is motivated to learn. . Plaintiff Sacramento Unified School District (the "District") proposes to educate Rachel half-time in a special education class with other handicapped children, and half-time in a regular classroom. Believing that Rachel would benefit from a full-time placement in a regular classroom, Rachel's parents appealed the District's placement decision to a California Special Education hearing officer. Following fourteen days of hearings, the hearing officer ruled in favor of the parents and ordered that the District place Rachel in a regular classroom with certain support services. The District now appeals from that decision. Both the parents and the California State Department of Education seek affirmance of the ruling below.

The court must determine whether the decision by the hearing officer complies with the Individuals with Disabilities Education Act (the "IDEA" or the "Act"), 20 U.S.C. §§ 1400–1485. The IDEA requires that a state which accepts federal funds must provide a "free appropriate" education to all children. 20 U.S.C. § 1412. The IDEA also requires that to the "maximum extent appropriate," handicapped children must be educated with non-handicapped children. The central question here is whether, for Rachel, a full time placement in a regular education class is the "appropriate" placement. For the reasons stated below, the court concludes that it is.

I

Rachel attended a variety of special education programs provided by the District from 1985 until 1989.[1] While Rachel was in special education classes provided by the

---

1. A complete history of Rachel's educational history and the Hollands' negotiations with the District is contained in the hearing officer's order at 2–5.

District, she spent a small part of each day with nonhandicapped children. For the period from 1987 through 1989, Rachel received no more than approximately one hour per day of integration with a regular class. Her parents repeatedly sought, with little success, to increase the amount of time Rachel spent in regular classrooms. In the fall of 1989, the Hollands requested that Rachel be placed full-time in a regular classroom for the 1989–90 school year. The District rejected this request and offered only special education placements for Rachel. Later, after mediation, the District proposed a placement for Rachel that included some integration into a regular classroom. The proposed placement would have divided Rachel's time between a regular class for nonacademic activities—such as art, music, lunch, and recess—and a special education class of handicapped children for all academic subjects. This would have required moving Rachel at least six times each day between the two classes. The Hollands rejected the District's proposals and entered Rachel in a regular kindergarten class at the Shalom School, a private school. Rachel has remained at the Shalom School in regular classes and is now in second grade. She is assisted by a part-time aide who sits by her in the classroom.

Although unable to agree on a placement for Rachel, the District and the Hollands, through mediation, agreed on an Individualized Education Program for Rachel. The IDEA requires such a program, known as an IEP, for each handicapped child and requires that it be reviewed at least annually. *See* 20 U.S.C. § 1401(19).[2] Because of the dispute between the District and the Hollands, Rachel's IEP has not been revised since January 1990. Rachel's 1990 IEP stresses language and communication goals. The agreed objectives include: speaking in four or five word sentences; repeating instructions of complex tasks; initiating and terminating conversations; verbally stating her name, address, and telephone number; participating in a personal safety program with classmates; developing a 24–word sight vocabulary; counting to 25; printing her first and last name and the alphabet; playing cooperatively; participating in lunch without teacher supervision; identifying upper and lower case letters and sounds associated with them; and following her schedule of daily activities.

The Hollands appealed the District's placement decision to a state hearing officer, as provided by the IDEA. *See* 20 U.S.C. § 1415(b)(2). The District's position at the hearing, as here, was that Rachel is too severely handicapped to benefit from a full time placement in a regular class. The Hollands offered testimony to support their view that Rachel best learns both social and academic skills in a regular education classroom, and that she would not benefit from being placed in a special education class.

Following a two week hearing, in a lengthy opinion dated August 15, 1990, the hearing officer found that the District had failed to make an adequate effort to educate Rachel in a regular class as required by the IDEA. The hearing officer found that Rachel had benefitted from her year of kindergarten in a regular class at the Shalom School. In reaching this conclusion, the hearing officer found the testimony of Rachel's teacher was entitled to more weight than District witnesses, who testified that Rachel's experience at Shalom was not successful. Further, the hearing officer found that Rachel was motivated to learn and that she learned by imitation and modeling such that she would benefit from a regular classroom setting. The hearing officer found no evidence that Rachel

---

2. The IEP "is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and where appropriate, the child...." *Board of Educ. v. Rowley,* 458 U.S. 176, 182, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982). The IEP contains a statement of (a) the child's present educational abilities; (b) annual and short-term achievement goals; (c) the educational services to be provided and the extent to which the child will participate in regular educational programs; (d) the projected date and duration of the services to be provided; and (e) a means for evaluating whether the objectives are being met. 20 U.S.C. § 1401(19).

would be disruptive in a regular education classroom and further concluded that Rachel's IEP goals were consistent with the first grade curriculum. Finally, the hearing officer found that the District had overstated the cost of placing Rachel in a regular classroom with supplemental aids, and that the cost of such a placement would not be so great that it weighed against placing Rachel in a regular classroom. The hearing officer ordered the District to place Rachel in a regular education classroom with appropriate support services, including a part-time special education consultant and a part-time classroom aide. Under the order, the parties were to agree on the aide and consultant time required, returning to the hearing officer if they were unable to reach an agreement.

The District appealed this determination to the district court. *See* 20 U.S.C. § 1415(e). In accordance with 20 U.S.C. 1415(e)(2),[3] the parties presented additional evidence during an evidentiary hearing held on December 16, 17, and 18, 1991. Since the decision of the hearing officer in 1990, Rachel has completed first grade and half of second grade at the Shalom School in regular classrooms.[4] The main purpose of the hearing was to provide evidence of Rachel's progress or lack of progress during this time period. Having considered the evidence presented at the evidentiary hearing, as well as the evidence presented before the hearing officer, the court now affirms the decision of the hearing officer

that Rachel Holland should be placed full-time in a regular classroom.[5]

## II

The Individuals with Disabilities Education Act, which governs this lawsuit, provides federal funds to states for the education of handicapped children. *Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). If a state elects to receive these funds, the Act requires that the state adopt certain procedures and practices in the education of the handicapped. The IDEA requires that each handicapped child be provided a free appropriate education, and be educated "to the maximum extent appropriate" with children who are not handicapped. 20 U.S.C. §§ 1412(1) and (5); *see* 20 U.S.C. § 1401(a)(1) (broadly defining "handicapped"). The free appropriate education requirement is satisfied if "personalized instruction is being provided with sufficient support services to permit the child to benefit from the instruction, and other items of the definitional checklist are satisfied." *Rowley*, 458 U.S. at 189, 102 S.Ct. at 3042.

█ The second requirement, that each child be educated with non-handicapped children to the maximum extent appropriate, is the basis of the dispute in this case. The Act requires each state receiving federal funds to establish

> procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children

---

3. Section 1415(e)(2) provides that a court reviewing an administrative determination of the placement of a handicapped child may hear additional evidence at the request of a party.

4. Although the hearing officer reviewed the appropriateness of Rachel's first grade placement, a year which is now past, the case is not moot. The dispute between the parties is a continuing one, and the same issues will recur throughout her academic life. The nine month school year does not provide enough time for the judicial review provided by the Act. "[A]dministrative and judicial review of an IEP is 'ponderous' and usually will not be complete until a year after the IEP has expired." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1041 (5th Cir.1989). Where, as here, the dispute over the IEP is "capable of repetition ... yet evading review," it is not mooted by the passage of time. *Rowley*,

458 U.S. at 186 n. 9, 102 S.Ct. at 3041 n. 9 (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)); *see Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975).

5. A district court reviewing an administrative determination under the IDEA conducts a de novo review, but gives due weight to the hearing officer's views. *Gillette v. Fairland Bd. of Educ.*, 932 F.2d 551, 553 (6th Cir.1991); *Norton School Comm. v. Massachusetts Dep't of Educ.*, 768 F.Supp. 900, 903–04 (D.Mass.1991). "The fact that [the IDEA] requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Rowley*, 458 U.S. at 204, 102 S.Ct. at 3050 (quoting 20 U.S.C. § 1415(e)).

878

who are not handicapped and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B). The placement of handicapped children in regular classrooms "to the maximum extent appropriate" is sometimes referred to as "mainstreaming" or as placement in the "least restrictive environment." *See* 34 C.F.R. § 300.550.[6] The Act "has a strong preference for mainstreaming" which rises to the level of a rebuttable presumption. *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044–45 (5th Cir.1989). The Act also views each handicapped child as having unique needs entitled to individualized consideration. *See* 20 U.S.C. §§ 1400(c), 1401(a)(16) & (19). Thus, the decision as to whether any particular child should be educated in a regular classroom setting, all of the time, part of the time, or none of the time, is necessarily an inquiry into the needs and abilities of one child, and does not extend to a group or category of handicapped children, as the District suggests. *See Daniel R.R.*, 874 F.2d at 1048 ("our analysis is an individualized, fact-specific inquiry").

### III

■ In considering whether the District has proposed a placement for Rachel that complies with the Act, the court must determine what is meant by the requirement that handicapped children be mainstreamed "to the maximum extent appropriate." Be-

cause the Act does not define this requirement, cases interpreting the Act guide the court's analysis. The federal appellate courts have recognized the following factors as relevant to determining if a placement is appropriate: (1) the educational benefits available to the child in a regular classroom, supplemented with appropriate aids and services, as compared to the educational benefits of a special education classroom; (2) the non-academic benefits to the handicapped child of interaction with nonhandicapped children; (3) the effect of the presence of the handicapped child on the teacher and other children in the regular classroom; and (4) the costs of supplementary aids and services necessary to mainstream the handicapped child in a regular classroom setting. *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 697 (11th Cir.1991); *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 153–54 (4th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Daniel R.R.*, 874 F.2d at 1048–50; *Roncker v. Walter*, 700 F.2d 1058 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).

■ As to the first factor, if the child's disabilities are so severe that he or she will receive little or no academic benefit from placement in a regular education class, then mainstreaming may not be appropriate. *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 879 (4th Cir.1989) (disparity between cognitive levels of handicapped 17–year old and non-handicapped peers so great that 17–year old would be simply "monitoring" regular classes). However, the Act's requirement of integration, based on recognition of the non-academic value of such integration, is not

6. At the evidentiary hearing held by this court, there was some disagreement as to what the terms "mainstreaming" and "full-inclusion" mean in the context of educating developmentally delayed or physically handicapped children. Mainstreaming means educating a handicapped child with non-handicapped peers. *Briggs v. Board of Educ.*, 882 F.2d 688, 691 (2d Cir.1989). As to full inclusion, the court accepts the definition offered by Dr. Wayne Sailor: that the handicapped child is a full member of a regular education class. Dr. Sailor testified that under full-inclusion, the child need not be in the classroom 100% of the time. He noted that the

child may be removed from that class to receive supplementary services such as physical or speech therapy when these services cannot be provided in the classroom. Under full-inclusion, the child's primary placement is in the regular education class, and the child has no additional assignment to any special class for handicapped children. *See* Pltf's Ex. 7, Lou Brown, *How Much Time Should Students with Severe Intellectual Disabilities Spend in Regular Education Classrooms and Elsewhere?*, TASH, 1991 Vol. 16, No. 1 at 40 ("based in" refers to "being a member of a real class").

overcome by a showing that a special education placement may be academically superior to placement in a regular classroom. *Roland v. Concord School Comm.*, 910 F.2d 983, 993 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) (citing *Roncker,* 700 F.2d at 1063); *Norton Sch. Comm. v. Massachusetts Dept. of Educ.,* 768 F.Supp. 900, 910 (D.Mass.1991). The Act's presumption in favor of mainstreaming requires that a handicapped child be educated in a regular classroom if the child can receive a satisfactory education there, even if it is not the best academic setting for that child. Further, in considering the relative educational benefits available in integrated and nonintegrated settings, the school district must demonstrate that it has considered "whether supplemental aids and services would permit satisfactory education in the regular classroom." *Greer,* 950 F.2d at 696. Only if the child cannot receive a satisfactory education in a regular education class, even if appropriate support services are offered, should the child be placed in a special education class. *See Roncker,* 700 F.2d at 1063.

The second factor addresses the significant non-academic benefits a handicapped child may receive from exposure to nonhandicapped peers. This factor reflects the fundamental purpose of the IDEA's mainstreaming requirement. A handicapped child may benefit from language and behavior models provided by nonhandicapped children. *See Daniel R.R.,* 874 F.2d at 1049 ("[T]he language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education environment."); *accord, Greer,* 950 F.2d at 697; *Liscio v. Woodland Hills Sch. Dist.,* 734 F.Supp. 689, 702 (W.D.Pa.), *aff'd w/o op.,* 902 F.2d 1561 (3d Cir.1990) (partial integration appropriate where child "benefits from his interaction with non-handicapped peers ... and enjoys such interaction"). Moreover, the non-academic bene-

fits of mainstreaming a child are closely related to the academic benefits. *See Greer,* 950 F.2d at 697. For example, a child may be better able to learn academic subjects because of improved self-esteem and increased motivation due to placement in regular education.

The third factor addresses the possible negative effects of placing a handicapped child in a regular classroom. The child may be disruptive to other children or may unreasonably occupy the teacher's time to the detriment of other students. *Daniel R.R.,* 874 F.2d at 1049. If other children are disadvantaged by the presence of the handicapped child, mainstreaming is not appropriate. *Id.* When evaluating the burden that would be created by placing a handicapped child in a regular education class, the school district must consider all reasonable means to minimize the demands on the teacher:

> A handicapped child who merely requires more teacher attention than most other children is not likely to be so disruptive as to significantly impair the education of other children. In weighing this factor, the school district must keep in mind its obligation to consider supplemental aids and services that could accommodate a handicapped child's need for additional attention.

*Greer,* 950 F.2d at 688. A teacher's aide can minimize the burden on the teacher if the handicapped child is not disruptive but needs special assistance. This factor weighs against placing a handicapped child in regular education only if, after taking all reasonable steps to reduce the burden to the teacher, the other children in the class will still be deprived of their share of the teacher's attention.

Finally, a school district may properly consider cost as a factor in making placement decisions.

> The school district must balance the needs of each handicapped child against the needs of other children in the district. If the cost of educating a handicapped child in a regular classroom is so great that it would significantly impact upon the education of other children in the

district, then education in a regular classroom is not appropriate.

*Greer,* 950 F.2d at 697; *see Barnett,* 927 F.2d at 154; *Roncker,* 700 F.2d at 1063 (cost a factor because excessive spending on one handicapped child may deprive other handicapped children). Only where the cost of placing a handicapped child in regular education will significantly affect other children in the district will this factor weigh against placement in a regular classroom.

In addition to the four factors discussed above, the District urges the court to consider the extent of curriculum modification as a distinct factor. But modification of the curriculum for a handicapped child, even dramatic modification, has no significance in and of itself. The IDEA, in its provision for the IEP process, contemplates that the academic curriculum may be modified to accommodate the individual needs of handicapped children. Curriculum modification becomes significant only if it bears upon the factors already noted. For example, modification of the curriculum may place undue burdens on the teacher both because to modify the curriculum is time consuming and to teach, in effect, two classes in one room could prove impossible. Also, a drastically modified curriculum could deprive the handicapped child of that sense of belonging to a regular class that is important to the achievement of nonacademic benefit.

## IV

█ The District has the burden of demonstrating that its proposed placement of Rachel in a regular classroom for slightly less than half of the day provides mainstreaming to "the maximum extent appropriate" for Rachel.[7] As discussed below, three of the four factors favor mainstreaming, and on the fourth, cost, the District has not met its burden.

### A. Educational Benefits to Rachel.

The first factor, the comparative educational benefits to placement in regular or special education classes, weighs in favor of placing Rachel in a regular classroom. The Holland witnesses credibly testified that all of Rachel's goals and objectives could be achieved either in the regular class with some curriculum modification, or through supplementary aids and services. Most of Rachel's IEP goals relate to communication, which the Holland witnesses testified could best be taught by exposure to other children. The District's proffered testimony was focussed primarily on Rachel's educational limitations, but did not establish that the educational opportunities available through special education were superior or equal to those available in a regular education setting.

The bulk of the evidence presented by the District related to Rachel's performance on achievement and aptitude testing conducted by the California Diagnostic Center, and observation of Rachel at school by members of the Diagnostic Center team that tested Rachel. According to the Diagnostic Center witnesses, Rachel has made no progress toward her 1990 IEP goals and derives little academic benefit from regular class placement. These witnesses further suggest that supplemental aids and services are ineffective. By contrast, the Hollands' witnesses testified that Rachel had made significant academic strides at the Shalom School. They suggest that her motivation to learn stems from the regular

---

7. The statutory presumption in favor of mainstreaming has been construed as imposing a burden on the school district to prove that a child cannot be mainstreamed. *Davis v. District of Columbia Bd. of Educ.,* 530 F.Supp. 1209, 1211 (D.D.C.1982) (school district has burden of proving that placement is appropriate).

   This burden is explicit in 45 C.F.R. § 84.34, a regulation which implements the Rehabilitation Act of 1973, designed to prevent discrimination against people with handicaps in any program receiving federal funding. "A recipient [of federal funds] shall place a handicapped person in the regular educational environment ... unless it is demonstrated *by the recipient* that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." Although this regulation is not promulgated under the IDEA, it reflects the same strong preference for mainstreaming. Moreover, the District also bears the burden of proof because it seeks to overturn the decision of the hearing officer.

classroom placement and that she is learning language and other skills from modelling the behavior of her non-handicapped peers. The California Department of Education agrees with the Hollands that Rachel benefits academically from placement in a regular education class.

It is evident that the contrary assessments of Rachel's academic progress are founded in conflicting educational philosophies. The Diagnostic Center witnesses do not believe that a child with Rachel's I.Q. can be effectively educated in a regular classroom.[8] They believe that Rachel's education at this point should focus on functional skills, such as handling money, doing laundry, and using public transportation. Conversely, the Holland experts believe that all handicapped children, even children with much greater handicaps than Rachel, are best educated in regular classrooms. They believe that it is a mistake to limit Rachel's learning opportunities to functional skills.

These sharply different points of view have led the experts to different evaluations of the progress Rachel has made since placement in a regular class at the Shalom School in 1989. One example illustrates how differing educational philosophies may color perceptions. During the November 1991 assessment, one of the Diagnostic Center witnesses observed Rachel in Hebrew class. She was holding the book upside down. The witness drew the conclusion that Rachel was deriving no benefit from inclusion in the class. One of the Holland witnesses observed the same incident. This witness saw that another child helped Rachel right the book and find her place. From this incident, the witness concluded that Rachel had positive interaction with her peers that would be important to her future ability to live in society.

The court suggests no criticism of these witnesses. But because of the radically different points of view from which they start, their observations on Rachel's academic progress are by no means objective.

Nonetheless, the court finds more credible the Holland witnesses' testimony concerning Rachel's academic progress. First, these witnesses have more background in evaluating handicapped children placed in regular classrooms, and they had greater opportunity to observe Rachel over an extended period of time in normal circumstances. Moreover, it appears that for much of the formalized testing by the Diagnostic Center, Rachel was uncomfortable and unhappy. Finally, to the extent that the Holland witnesses have a preference for mainstreaming, it is a preference shared by Congress and embodied in the IDEA.

Because of the conflict among the experts as to Rachel's academic progress, the testimony of her current teacher is all the more important. The District concedes that Nina Crone, Rachel's second grade teacher, is an experienced, skillful teacher. She has no partisan involvement in this controversy. Crone testified that Rachel is a full member of the second grade class. She participates in all activities. For the class as a whole, Crone's major areas of emphasis are socialization, behavior and communication. These are the same areas of emphasis in Rachel's IEP. Crone testified that Rachel was making progress on her IEP goals. For example, Crone noted that Rachel is learning one-to-one correspondence in counting. She can recite the English and Hebrew alphabets, and her communication abilities and sentence length are also improving. Crone testified that Rachel is in many ways a typical second grader. She is eager to participate in class activities and is very motivated. She has become more self-confident and independent. Crone's testimony is consistent with the testimony of Rachel's kindergarten teacher at the Shalom School. *See* hearing officer's op. at 5–6.

The District offered no persuasive evidence that Rachel would receive educational benefits in special education classes that

---

**8.** "The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate." *Roncker,* 700 F.2d at 1063 (citing *Campbell v. Talladega City Bd. of Educ.,* 518 F.Supp 47, 55 (N.D.Ala.1981)).

are equal to or greater than those available in special education classes. Although the District's witnesses testified that many of Rachel's IEP goals could best be implemented in a special education setting, there is no empirical evidence to support this assertion. Rachel made very little progress while in special education in kindergarten. Her special education teacher testified that Rachel had an extremely slow rate of learning, poor social skills, and interacted better with adults than children. When Rachel was shuttled into a regular education class for an informal mainstreaming program, she was treated as an outsider by the non-handicapped children and derived little benefit from her short exposure to these children. The program currently proposed by the District mirrors in part the deficiencies of the previous program. The proposed program would move Rachel out of the regular class whenever academic subjects were being taught. Rachel would be moved in and out of class at least six times per day. Such a program would mark Rachel as an outsider, depriving her of the primary benefit of mainstreaming.

In short, the District has failed to meet its burden of establishing that Rachel would not receive academic benefits in regular classes and has failed to demonstrate that placement in special classes will provide equal or greater educational benefit to Rachel. Based on the record below and the supplemental evidence presented at the hearing, the court finds that Rachel receives substantial academic benefits in regular education. The court finds that all of Rachel's IEP goals could be implemented in a regular education setting with some modification to the curriculum and with the assistance of a part-time aide.[9]

### B. Non-academic Benefits to Rachel.

As discussed above, a handicapped child may derive significant non-academic benefits from education with nonhandicapped peers. The District's evidence tended to show that Rachel is not learning from exposure to other children and that she is isolated from her classmates. The Hollands' evidence supported the conclusion that Rachel has developed her social and communication skills as well as her self-confidence from her placement in regular education. As before, these differing evaluations in large part reflect the predisposition of the evaluators. The court finds the testimony by Rachel's current teacher and Rachel's mother the most credible as to the non-academic benefits Rachel derives from her placement in a regular classroom. Perhaps the strongest evidence that Rachel is gaining incidental benefits from being mainstreamed is her excitement about school and her improved self-confidence. The two witnesses who testified to Rachel's positive attitude, her mother and her teacher, are in a far better position to know and understand Rachel's emotional well-being and social development than the District's witnesses, who evaluated Rachel primarily by using standardized testing techniques. Although Rachel's mother cannot be considered an objective observer, she has had the opportunity to compare Rachel's attitude toward school when she was in special education and since she has been in regular education. She testified that since Rachel was placed in a regular class, she has been excited and enthusiastic about learning. Rachel relishes the new friendships that she has developed at the Shalom School. Because of the evidence that Rachel is developing socially from her full-time placement in a regular education class, this

---

**9.** In defending its proposed placement, the District argues that the California Department of Education and the Holland experts ignore the IDEA's requirement that school districts provide an appropriate continuum of educational placements. The District misunderstands the requirements of the IDEA. The IDEA requires mainstreaming to the maximum extent appropriate. Because the extent of mainstreaming that is appropriate will vary from child to child, a continuum of placements is necessary to comply with the IDEA's mandate. However, mainstreaming is the starting point and presumption. A placement in other than a regular class is a fall-back choice made only *after* it is determined that placement in regular classes will be unsuccessful.

factor weighs in favor of placing Rachel in a regular class.[10]

### C. Effect on the Teacher and Other Children.

The third factor—effect on others in the class—has two aspects. The first is whether there is detriment to the other students because the handicapped child is disruptive, distracting, or unruly. There has been no evidence presented to this court that Rachel is a discipline problem at school or distracts other children. The witnesses, including the District's, were in agreement that Rachel is an agreeable child who follows directions and is well-behaved. When Rachel works separately with her aide, it is not a distraction for the other children. The second consideration is whether the handicapped child would take up so much of the teacher's time that the other students would suffer from lack of attention. The most germane evidence on this point comes from Rachel's second grade teacher, who testified that she does not find that Rachel's presence interferes with her ability to teach the other children. Rachel's teacher testified that she was initially apprehensive about her ability to teach Rachel and the rest of the class. Now that she has had experience with Rachel, she finds that Rachel's assignment to her class is not burdensome.

Because there is no evidence of detriment to other children in Rachel's regular education classroom, this factor also weighs in favor of placing Rachel in a regular education program.

### D. Cost

The question of how much it would cost to place Rachel in a regular education class with the necessary support services was vigorously contested by the District on one hand and by the California Department of Education and the Hollands on the other. According to the District witnesses, the placement that the Hollands are requesting for Rachel would cost $109,000 per year. This cost estimate is based on a full-time aide for Rachel, and also attributes to Rachel alone the cost of school-wide training programs that would benefit other students.

The District has painted an exaggerated, hyperbolic picture of what it would cost to educate Rachel in a regular classroom with appropriate support services. For example, the District claims that it would cost over $80,000 to provide school-wide sensitivity training. Yet the District does not establish that such training is necessary. And even if it is, the California Department of Education provided evidence that such training may be had for free. Nor is it appropriate to assign the total cost to Rachel when other handicapped children will benefit. Similarly, the evidence does not suggest that Rachel requires a full-time aide.[11]

In reality the cost comparison is between placing Rachel in a special class with a full-

---

**10.** Rachel is currently in second grade. The District asserts that Rachel should be placed in fourth grade next year so she can model age appropriate behavior. However, Dr. Sailor testified that although Rachel should be educated with children near her age, it is not necessary that there be an exact match. Rachel is no more than two years older than the children with whom she is now placed. This age difference is not so pronounced that she is learning inappropriate behavior, or is not perceived as part of the class.

**11.** The District asserts that the Hearing Officer's proposed placement in a regular second grade class with a part-time aide violates California law requiring that handicapped children receive instruction on their IEP goals from specially credentialed teachers. This argument misconceives California's credentialing requirements.

Although Rachel's educational program must be supervised by an appropriately credentialed professional, there is no requirement that she learn academic subjects only from a special education credentialed teacher. Furthermore, even if California did require that handicapped children be taught only by specially credentialed teachers, it would conflict with the IDEA's mainstreaming requirement favoring education by regular teachers. Where federal law conflicts with state law, federal law prevails.

Furthermore, Cal.Educ.Code § 56101 provides that a school district can request a waiver of any provision of the Education Code necessary to implement a student's IEP. The District could apply for a waiver of the credentialing requirement, if there were one, in order to educate Rachel in a regular class.

time special education teacher and two full-time aides, with approximately 11 other children, with placing her in a regular class with a part-time aide. The District has provided no evidence of this cost comparison, presumably because the difference is modest. To the extent that the special class has fewer than 12 children, and that the cost of a special education teacher exceeds that of an aide, the difference in cost will be reduced. Moreover, the California Department of Education provides free in-service training programs to assist schools that wish to fully integrate handicapped students.

The District also argues that it will lose significant funding from the state if Rachel does not spend at least 51% of her time in special education classes. Ordinarily, state funding is allocated according to a formula that is based in part on how much time a child spends in a special education class. If Rachel were moved out of special education class, the District claims it would lose funding equivalent to one teacher and three aides. However, the California Department of Education witness testified that waivers are available from the state if a school district seeks to adopt a program that does not fit neatly with funding guidelines. If a school district receives a waiver, it will not lose any funding because it places handicapped students in regular classes. The District has not applied for such a waiver. According to the California Department of Education's evidence, the District will incur little additional cost by providing full-time placement in regular education classes among the continuum of options offered to handicapped children.

Furthermore, the IDEA provides funding for the specific purpose of educating handicapped children, and envisions that those monies will be used in part to provide the supplemental aids and services that make mainstreaming possible. The funding provisions suggest that the IDEA foresees some possible increased costs due to mainstreaming. Those increased costs are permissible so long as they are not of a magnitude that will affect other programs or other handicapped children

In short, the court concludes that the cost of placing Rachel full-time in a regular class, as opposed to placing her in a special class for handicapped children, is modest if there is any additional cost at all. By inflating the costs, and failing to address the true comparison, the District does not meet its burden of proving that regular placement would burden the District funds or adversely affect services available to other children. Because the District has offered no persuasive or credible evidence in support of its claim that educating Rachel in a regular education classroom with appropriate services would be significantly more expensive than educating her in the District's proposed setting, this factor does not weigh against mainstreaming Rachel.

## V

For the reasons discussed, the court finds that the appropriate placement for Rachel Holland, under the Individuals with Disabilities Education Act, is in a regular second grade classroom, with some supplemental services, as a full-time member of that class.

Children change, the educational demands on them change, and Rachel may change.[12] If Rachel does not flourish under this placement in the future, then adjustments should be made. The IDEA foresees such adjustments at the annual IEP review. But the weight of the evidence suggest that this is the appropriate placement now for Rachel Holland.

The decision of the hearing officer is affirmed.

IT IS SO ORDERED.

---

12. *See* Brown, *supra* note 6, at 46 ("How much time should be spent in regular classes? Enough to ensure that the student is a member, not a visitor. A lot, if the student is engaged in meaningful activities. Quite a lot if she is young, but less as she approaches 21. There is still a lot we do not know.").