**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| D. R., a minor, by and through his guardian ad litem R. R., *Plaintiff-Appellant,* <br><br> v. <br><br> REDONDO BEACH UNIFIED SCHOOL DISTRICT, a local educational agency, *Defendant-Appellee.* | No.21-56053 <br><br> D.C. No. 2:20-cv-06307-JFW-MAA <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted October 19, 2022
Pasadena, California

Filed December 20, 2022

Before: Paul J. Watford and Andrew D. Hurwitz, Circuit
Judges, and Eric N. Vitaliano,[*] District Judge.

---

[*]The Honorable Eric N. Vitaliano, United States District Judge for the
Eastern District of New York, sitting by designation.

Opinion by Judge Watford

## SUMMARY[**]

### Individuals with Disabilities Education Act

The panel affirmed in part and reversed in part the district court's judgment affirming an administrative law judge's decision denying relief under the Individuals with Disabilities Education Act to D.R., a student in Redondo Beach Unified School District.

D.R.'s parents believed that D.R., a child with autism, should continue to spend most of the school day being educated in a regular classroom with his non-disabled peers. School officials, however, believed that D.R. would be better served spending more of his school day in a special education classroom receiving instruction with other disabled students.

Reversing in part, the panel held that, given the IDEA's strong preference for educating children with disabilities alongside their non-disabled peers, the law supported the parents' position. The panel held that D.R.'s parents met their burden of proving that the school district's proposed individualized education program (IEP) failed to comply with the IDEA's required that children with disabilities be educated in the "least restrictive environment," alongside their non-disabled peers to the maximum extent

[**]This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

appropriate. The parties agreed that, under the four-factor *Rachel H.* test, maintaining D.R.'s placement in the regular classroom for 75% of the school day was supported by factors two, three, and four: the non-academic benefits he derived from being educated in a regular classroom, the lack negative effects D.R.'s presence had on the education of other children in the classroom, and the school district's failure to contend that the cost of providing D.R. with supplementary aids and services was prohibitively expensive.

The panel held that the first *Rachel H.* factor, the academic benefits D.R. received from placement in the regular classroom, also supported that placement. The panel held that the proper benchmark for assessing whether D.R. received academic benefits from his placement in the regular classroom was not grade-level performance, but rather was whether he was making substantial progress toward meeting the academic goals established in his IEP. The panel further held that the fact that D.R. received academic benefits in the regular classroom as a result of supplementary aids and services was irrelevant to the analysis required under the first *Rachel H.* factor.

Affirming in part, the panel held that D.R.'s parents were not entitled to reimbursement for the expenses they incurred after unilaterally removing their son from school and hiring a private instructor to educate him in a one-on-one setting. The panel concluded that D.R.'s parents showed that the IEP offered by the school district violated the IDEA, but they did not show that the alternative private placement they chose was proper under the Act.

**COUNSEL**

David W. German (argued), Vanaman German LLP, Sherman Oaks, California, for Plaintiff-Appellant.

Kristin M. Myers (argued) and Marlon C. Wadlington, Atkinson Andelson Loya Ruud & Romo, Cerritos, California, for Defendant-Appellee.

Alexis V. Casillas, Learning Rights Law Center, Los Angeles, California; Claudia Center and Malhar P. Shah, Disability Rights Education and Defense Fund, Berkeley, California; Selene A. Almazan-Altobelli, Council of Parent Attorneys and Advocates Inc., Townson, Maryland; Robert J. Borrelle Jr. and Melinda Bird, Disability Rights California, Los Angeles, California; for Amici Curiae Council of Parent Attorneys and Advocates Inc., Disability Rights Education & Defense Fund, Disability Rights California, Disability Law Center of Alaska, Arizona Center for Disability Law, Disability Rights Montana, Disability Rights Oregon, Disability Rights Washington, California Association For Parent-Child Advocacy, and The Learning Rights Law Center.

William S. Kroski andAbigail Trillin; Bruce Easop, Certified Law Student; Stanford Law School Youth & Education Law Project Mills Legal Clinic, Stanford, California, for Amici Curiae The Arc of the United States, The Bazelon Center for Mental Health Law, The National Disability Rights Network, and The Native American Disability Law Center.

# OPINION

WATFORD, Circuit Judge:

This is a dispute under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, between the parents of a child with autism and the school district in which he was enrolled.  The parents believe their son, D.R., should spend most of the school day being educated in a regular classroom with his non-disabled peers.  School officials believe D.R. would be better served spending more of his school day in a special education classroom receiving instruction with other disabled students.  Given the IDEA's strong preference for educating children with disabilities alongside their non-disabled peers, we conclude that the law supports the parents' position.  However, we hold that the parents are not entitled to reimbursement for the expenses they incurred after unilaterally removing their son from school and hiring a private instructor to educate him in a one-on-one setting.

## I

The IDEA provides federal funding to States to help ensure that all children with disabilities receive "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  States that accept funding are required to educate children with disabilities in what is known as the "least restrictive environment."  Under that requirement, States and their local educational agencies must ensure that:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

§ 1412(a)(5)(A).  Congress imposed the least restrictive environment requirement because it found that children with disabilities were often "excluded entirely from the public school system and from being educated with their peers," even though decades of research and experience have shown that "the education of children with disabilities can be made more effective by . . . ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible."  § 1400(c)(2)(B), (5)(A).

The IDEA requires parents and school officials to develop an individualized education program (IEP) tailored to the unique needs of each child with a disability. §§ 1401(14), 1414(d).  The IEP must include, among other things: (1) a statement of measurable academic goals for the child designed "to enable the child to be involved in and make progress in the general education curriculum"; (2) a description of how the child's progress toward those goals will be measured; (3) "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class"; and (4) "a statement of the

special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." § 1414(d)(1)(A)(i)(II)–(V). The IDEA defines the term "supplementary aids and services" as "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with section 1412(a)(5) of this title." § 1401(33).

In this case, D.R.'s parents worked cooperatively with school officials at D.R.'s elementary school to develop an IEP for him. (It is undisputed that D.R. qualifies as a child with a disability and that the school district in which he was enrolled is bound by the IDEA's requirements.) Before the start of third grade, D.R.'s parents and school officials agreed to an IEP under which D.R. would spend 75% of his school day in the regular classroom with appropriate supplementary aids and services to support his academic progress. Those aids and services included a full-time behavioral aide who worked one-on-one with D.R. in the regular classroom to help him follow a modified general education curriculum, as well as four hours per week of special education instruction outside the regular classroom in the school's Learning Center. The ultimate purpose of this IEP was to allow D.R. to achieve the individualized goals that his IEP team had set for him, which defined academic success for D.R. in a manner different from the grade-level standards that the school district expected non-disabled students to meet in a given year.

Midway through third grade, the IEP team reconvened to assess D.R.'s progress. The team agreed that D.R. was progressing socially, but school officials believed D.R.

required more direct instruction by a credentialed special education teacher to make adequate academic progress. They recommended a blended program in which D.R. would remain in the regular classroom during the morning but spend the afternoon in a special education classroom, called the Special Day Class, where he could receive instruction alongside other children with disabilities. D.R.'s parents disagreed, insisting that D.R. was making adequate progress in his current placement. Given the parents' objections, school officials did not implement their proposal, and D.R. remained in his existing placement (75% of the school day in the regular classroom) for the remainder of the school year.

At the annual IEP meeting held before D.R. started fourth grade, the IEP team agreed that D.R. had made considerable social and academic progress during the prior school year. But school officials reiterated their concerns that the regular classroom environment did not adequately serve D.R.'s needs, and they recommended placing him in the Special Day Class for 56% of the school day so that he could receive specialized instruction in the core academic subjects of language arts and math. D.R.'s parents again objected to the school officials' proposal, and D.R.'s placement again remained unchanged.

Before the start of fifth grade, the IEP team reconvened to develop D.R.'s IEP for the upcoming school year. The team agreed that D.R. had met four of his six academic goals for the fourth-grade year and that he had made progress on the remaining two. Nevertheless, school officials believed D.R. was not making adequate progress in his current placement. They noted that he was performing several grade levels below his non-disabled peers in language arts and math and that, as a result, he spent most of his time in the

regular classroom working one-on-one with his aide on assignments that were tied to a heavily modified general education curriculum. The outcome was that D.R. often followed the general class schedule—for example, practicing grammar skills at the same time as his non-disabled peers—but not the actual class lessons in the core subjects. To provide D.R. with greater individualized attention and a curriculum geared toward his particular needs, school officials again proposed placing him in the Special Day Class for 56% of the school day.

Upon receiving the school district's latest proposal, D.R.'s parents terminated the IEP meeting and removed D.R. from the school. After trying unsuccessfully to find a private school that would accept D.R., they hired a private instructor to teach him in a one-on-one educational program.

As permitted under the IDEA, D.R.'s parents requested a due process hearing before the California Office of Administrative Hearings. *See* 20 U.S.C. § 1415(f). They argued that the school district's proposed fifth-grade IEP violated the IDEA's least restrictive environment requirement by removing D.R. from the regular classroom for a majority of the school day. They also sought reimbursement for the expenses they had incurred hiring a private instructor for D.R.

After conducting a four-day evidentiary hearing, an administrative law judge (ALJ) ruled that the school district's proposed placement for D.R. did not violate the IDEA. The parents then sought review in the District Court for the Central District of California. Because neither side sought to introduce any new evidence, the district court limited its review to the record of the administrative proceedings, giving "due weight" to the ALJ's findings. *See*

*Capistrano Unified School District v. Wartenberg*, 59 F.3d
884, 890–91 (9th Cir. 1995).   The court agreed with the
ALJ's analysis and affirmed the decision denying relief.

## II

The principal issue on appeal is whether the school
district's proposed IEP complied with the least restrictive
environment requirement.     Because D.R.'s parents
challenged the proposed IEP, they bore the burden of
proving that it violated the IDEA. *See Schaffer v. Weast*, 546
U.S. 49, 62 (2005).   We review the district court's factual
findings for clear error and its determination that the
proposed IEP satisfied the least restrictive environment
requirement *de novo*. *See Amanda J. v. Clark County School
District*, 267 F.3d 877, 887 (9th Cir. 2001).

As discussed above, school districts subject to the IDEA
must ensure that children with disabilities are educated
alongside their non-disabled peers "[t]o the maximum extent
appropriate."   20 U.S.C. § 1412(a)(5)(A).   School officials
may remove a disabled child from the regular classroom
"only when the nature or severity of the disability of a child
is such that education in regular classes with the use of
supplementary aids and services cannot be achieved
satisfactorily."   *Id.*   This provision reflects the IDEA's
"strong preference" for educating children with disabilities
in a regular classroom environment. *Poolaw v. Bishop*, 67
F.3d 830, 834 (9th Cir. 1995).

We have established a four-factor test to determine
whether a school district has complied with the least
restrictive environment requirement. *See Sacramento City
Unified School District v. Rachel H.*, 14 F.3d 1398, 1404
(9th Cir. 1994).   The first and most important factor
compares the academic benefits a child receives from

placement in the regular classroom with the academic benefits available in a special education classroom. *See id.* at 1400–01; *Poolaw*, 67 F.3d at 836. The second factor considers the non-academic benefits a disabled child derives from being educated in a regular classroom, *Rachel H.*, 14 F.3d at 1404, such as "the development of social and communication skills from interaction with nondisabled peers," *Oberti v. Board of Education*, 995 F.2d 1204, 1216 (3d Cir. 1993); *see also Ms. S. v. Vashon Island School District*, 337 F.3d 1115, 1137 (9th Cir. 2003), *superseded by statute on other grounds*, 20 U.S.C. § 1414(d)(1)(B). The third factor weighs the potential negative effects a disabled child's presence may have on the education of other children in the classroom. *Rachel H.*, 14 F.3d at 1404. The fourth factor considers the costs to the school district of providing the supplementary aids and services necessary to educate a disabled child in the regular classroom. *Id.*

The parties agree that the second, third, and fourth factors weigh in favor of maintaining D.R.'s placement in the regular classroom for 75% of the school day. D.R. derived significant non-academic benefits from the time he spent in the regular classroom during second through fourth grades. He became close friends with several of his non-disabled classmates, and those friendships helped D.R. develop his interpersonal skills and build his self-confidence. D.R.'s presence in the regular classroom did not impede his teachers' ability to instruct other students, and D.R. exhibited no behavioral problems that otherwise disrupted the classroom. The fourth factor—cost—does not affect the balance here, as the school district does not contend that the cost of providing D.R. with supplementary aids and services was prohibitively expensive.

Where the parties differ is on the first *Rachel H.* factor—the academic benefits D.R. received from his placement in the regular classroom. The school district contends that D.R. derived essentially no academic benefit from that placement. It emphasizes that D.R. spent most of his time working one-on-one with his aide using a heavily modified curriculum and that he lagged so far behind his non-disabled peers that he could rarely participate in activities with the rest of the class. The district court accepted this view, finding that D.R. was "effectively on an island in general education for academic purposes." The court ruled that the first *Rachel H.* factor outweighed the other three and justified placing D.R. in the more restrictive educational setting that the school district had proposed.

In our view, the district court's decision rests on two legal errors, both of which require reversal.

## A

The first error concerns the proper benchmark for assessing whether D.R. received academic benefits from his placement in the regular classroom. The IDEA prohibits placing children with disabilities in a more restrictive educational setting unless education in the regular classroom with the use of supplementary aids and services "cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The question thus becomes how to measure whether a child is making enough academic progress to conclude that his education is being achieved "satisfactorily."

Both the ALJ and the district court placed great weight on the fact that D.R. was performing several grade levels below his non-disabled peers and could not keep up with the pace of instruction in the regular classroom. In third-grade language arts, for example, the ALJ noted that D.R. "could

write four sentences from dictation with grade level word spacing in 25 percent of his trials," while his non-disabled peers were writing three paragraphs or more and working on skills like editing and drafting topic sentences. In fourth-grade math, the ALJ noted that D.R. worked on two-digit addition problems while his non-disabled peers were learning multiplication and fractions. Based on this and similar evidence, the ALJ and the district court concluded that D.R.'s education in the regular classroom could not be achieved "satisfactorily."

We disagree. A satisfactory education is not a one-size-fits-all concept. For children who are capable of following an IEP with academic goals that closely track grade-level standards, performance at grade level may provide the appropriate benchmark for measuring the academic benefits they receive from placement in the regular classroom. *See Endrew F. v. Douglas County School District RE-1*, 137 S. Ct. 988, 999–1000 (2017). But grade-level performance is not the appropriate benchmark for all disabled children. For children whose developmental disabilities preclude them from achieving at the same academic level as their non-disabled peers, the appropriate benchmark for measuring the academic benefits they receive is progress toward meeting the academic goals established in the child's IEP. *See L.H. v. Hamilton County Department of Education*, 900 F.3d 779, 793 (6th Cir. 2018); *County of San Diego v. California Special Education Hearing Office*, 93 F.3d 1458, 1462 (9th Cir. 1996). As the Supreme Court has held, an IEP's academic goals "need not aim for grade-level advancement" when that level of achievement is not obtainable, but they must be "appropriately ambitious" in light of the child's unique circumstances. *Endrew F.*, 137 S. Ct. at 1000. The IEP's academic goals therefore provide the relevant

yardstick for assessing a child's academic progress for purposes of the first *Rachel H.* factor.

The undisputed evidence in this case establishes that D.R. was making substantial progress toward meeting the academic goals established in his IEP.  In fact, by the end of his fourth-grade year, D.R. had *met* four of his six academic goals and had made progress on the remaining two.  This record of achievement indicates that D.R. was receiving significant academic benefits from his existing placement when measured against the proper yardstick.

The school district contends that even if D.R. made substantial progress toward meeting his IEP goals in the regular classroom, he could have made more progress in the Special Day Class receiving individualized attention and special curricular offerings.  The record does not support the school district's prediction.    D.R.'s parents presented unrebutted expert testimony, based on a wealth of academic literature and peer-reviewed studies, establishing that the vast majority of children with developmental disabilities perform better academically when they are educated in an inclusive general education environment as opposed to an isolated special education environment, like the Special Day Class.  *See, e.g.*, National Council on Disability, The Segregation of Students with Disabilities 37–38 (2018); Thomas Hehir *et al.*, Instituto Alana, A Summary of the Evidence on Inclusive Education 13 (2016).  The positive correlation between academic achievement and time spent in the regular classroom holds true even for children who, like D.R., have significant developmental disabilities and are performing several grade levels below their non-disabled peers.    In addition, D.R.'s parents presented unrebutted expert testimony establishing that (1) the curriculum used in the Special Day Class—the Unique Learning System—is

designed for students who are far less academically proficient than D.R.; and (2) if used at all, it should supplement rather than replace the modified version of the general education curriculum that D.R. had been following. It thus cannot be said on this record that D.R. would derive greater academic benefits from placement in the Special Day Class for 56% of the school day.[1]

These facts distinguish this case from *Baquerizo v. Garden Grove Unified School District*, 826 F.3d 1179 (9th Cir. 2016), on which the school district relies. There, we held that academic considerations outweighed the other *Rachel H.* factors and justified the school district's proposal to place the student outside the regular classroom. *Id.* at 1188. The student had not attended a public school for years and had no track record of academic success in the regular classroom. *Id.* at 1181–83. The student's private instructor testified that he needed to be educated in a one-on-one environment because he would not progress academically if educated alongside his non-disabled peers. *Id.* at 1188. D.R., by contrast, made significant academic progress inside the regular classroom during the two school years prior to

---

[1] Even if D.R. might have received greater academic benefits in the Special Day Class, the IDEA's strong preference for educating disabled children alongside their non-disabled peers "is not overcome by a showing that a special education placement may be academically superior to placement in a regular classroom." *Board of Education v. Holland*, 786 F. Supp. 874, 878–79 (E.D. Cal. 1992), *aff'd*, 14 F.3d 1398 (9th Cir. 1994). If a child is making substantial progress toward meeting his IEP's academic goals, the fact that he might receive a marginal increase in academic benefits from a more restrictive placement will seldom justify sacrificing the substantial non-academic benefits he derives from being educated in the regular classroom. *See Oberti*, 995 F.2d at 1216–17.

the school district's proposal, and his private instructor as well as the experts testified that he belonged in that more inclusive setting. Unlike in *Baquerizo*, then, there is no need here to balance the *Rachel H.* factors against each other because no factor supports moving D.R. to a more restrictive placement.

B

The district court committed a second legal error that requires reversal. In analyzing the first *Rachel H.* factor, the court accepted the ALJ's finding that D.R.'s progress toward meeting his IEP's academic goals was attributable not to his participation in the regular classroom, but rather to the supplementary aids and services he was receiving—namely, his one-on-one aide in the regular classroom and the special education instruction he received in the Learning Center. However, the fact that a child receives academic benefits in the regular classroom as a result of supplementary aids and services is irrelevant to the analysis required under the first *Rachel H.* factor.

The IDEA permits a more restrictive placement only if "education in regular classes *with the use of supplementary aids and services* cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A) (emphasis added). Whenever feasible, a school district must push support services into the regular classroom rather than pull students out of it. *See Greer v. Rome City School District*, 950 F.2d 688, 696 (11th Cir. 1991), *withdrawn and reinstated in relevant part*, 967 F.2d 470 (11th Cir. 1992). As D.R.'s parents argue, if a child's education is being achieved satisfactorily due to the supplementary aids and services he receives, those aids and services should be continued so that the child can remain in the regular classroom. In other words, a child's reliance on

supplementary aids and services to achieve a satisfactory education in the regular classroom cannot be used against him to justify a more restrictive placement.

The district court also found pertinent the fact that D.R. required significant modifications to the general education curriculum. But just as the IDEA is clear that a school district may not penalize a child for relying on the supplementary aids and services he receives, the law is also clear that a school district may not remove a child from the regular classroom "solely because of needed modifications in the general education curriculum." 34 C.F.R. § 300.116(e). Thus, as with a child's reliance on support services, whether a child requires significant curricular modifications is irrelevant to the first *Rachel H.* factor. As indicated above, the relevant question is whether the child can receive satisfactory academic benefits inside the regular classroom, measured by progress toward meeting the academic goals established in the child's IEP.

In sum, we conclude that the IEP proposed by the school district before D.R.'s fifth-grade year violated the IDEA. By requiring him to spend 56% of the school day in a special education classroom, the proposed IEP failed to offer D.R. a free appropriate public education in the least restrictive environment, as required under 20 U.S.C. § 1412(a)(5)(A).

## III

The remaining issue is whether D.R.'s parents are entitled to reimbursement from the school district for the expenses they incurred after removing D.R. from the school and hiring a private instructor to educate him in a one-on-one setting. The IDEA permits reimbursement if D.R.'s parents can show both that the IEP offered by the school district violated the IDEA and that the alternative private

placement they chose was proper under the Act. *See C.B. v. Garden Grove Unified School District*, 635 F.3d 1155, 1159 (9th Cir. 2011); 20 U.S.C. § 1412(a)(10)(C). Because reimbursement is a form of discretionary equitable relief, a court must also assess the reasonableness of both parties' conduct to determine whether reimbursement is warranted. *See Anchorage School District v. M.P.*, 689 F.3d 1047, 1058–59 (9th Cir. 2012). Relevant factors include the existence of more suitable placements for the student and the parties' level of cooperation during the IEP process. *Id.*

The ALJ denied the parents' request for reimbursement after concluding that the school district's proposed IEP did not violate the IDEA. We have reached the opposite conclusion, which requires an inquiry into whether the parents' alternative placement was proper and reasonable under the circumstances. We think the answer to that question is sufficiently clear to obviate the need for a remand.

Reimbursement is not appropriate in this case because D.R.'s parents should not have unilaterally withdrawn him from school in response to the school district's IEP offer. The parents had rejected the school district's two earlier placement offers during D.R.'s third- and fourth-grade years, and the school district accordingly never implemented those proposals. In fact, under California law, the school district could not have altered D.R.'s placement without first requesting a due process hearing with the state agency. Cal. Educ. Code § 56346(f). Thus, when the school district renewed its offer for fifth grade, D.R.'s parents could have reasserted their objections and waited to see if the school district would yield once more. Or, if the parents themselves requested a due process hearing, they could have relied on the IDEA's "stay-put" provision to maintain D.R.'s existing

placement pending resolution of that proceeding. 20 U.S.C. § 1415(j). But rather than following either of these routes, the parents terminated the IEP meeting and placed D.R. in an educational setting even more restrictive than the one the school district had proposed. In these circumstances, the expenses D.R.'s parents incurred in hiring a private instructor were not necessary to ensure that D.R. continued to receive a free appropriate public education in the least restrictive environment.

We understand the parents' concern that school officials appeared to lack faith in D.R.'s ability to learn in the regular classroom. These concerns were aggravated when the school district misstated its offer at the last IEP meeting, making it appear as though the school district had proposed placing D.R. in the Special Day Class for 88% of the school day, rather than the 56% it had earlier proposed. The parents had no way of knowing that this was a mere "clerical error," as the school district now describes it. Still, because D.R.'s parents sought to maintain his current placement, the proper course of action would have been to rely on California's procedural protections and the IDEA's stay-put provision to keep D.R. in a placement that provided him with substantial academic and social benefits. Had this occurred, the school district could have clarified its mistake, and the two sides potentially could have reached a resolution on D.R.'s placement without the need to remove him from school. At the very least, the parents could have preserved the status quo until the school district decided whether to pursue a due process hearing. And even when the parents decided to pursue such a hearing, as was their right, the stay-put provision would have kept D.R. in his current placement until the case was resolved. The parents instead opted not to continue with the IEP process nor to rely on the legal

protections that would have kept their son in his existing placement. For these reasons, reimbursement is not warranted.

*       *       *

If D.R. decides to re-enroll in the school district, he is entitled to a free appropriate public education in the least restrictive environment. We cannot determine what D.R.'s appropriate placement should be at this juncture, three years after the dispute at issue here arose. *See Rachel H.*, 14 F.3d at 1405. Nonetheless, the school district must adhere to the principles outlined in this opinion when working with D.R.'s parents to craft his next IEP.

**AFFIRMED in part and REVERSED in part.**

The parties shall bear their own costs.